1  WILLIAM H. SHAWN
2  JAMES E. KING (CSB NO. 90103)
   SHAWNCOULSON, LLP
3  1850 M St., NW. Suite 280
   Washington, DC 20036
4  Telephone: (202) 331-7900
   Facsimile: (202) 403-3747
5
6  ANDREW P. BRIDGES (CSB No. 122761)
   ILANA S. RUBEL (CSB No. 221517)
7  LIWEN MAH (CSB No. 239033)
   FENWICK & WEST LLP
8  555 California Street, 12th Floor
   San Francisco, CA  94104
9  Telephone:  415.875.2300
   Facsimile:   415.281.1350
10 Attorneys for Defendants
11 IWEB GROUP, INC.,
   IWEB INTELLECTUALPROPERTY, INC., and
12 IWEB TECHNOLOGIES, INC.
13
14          UNITED STATES DISTRICT COURT
15          SOUTHERN DISTRICT OF CALIFORNIA
16
17 PERFECT 10, INC., a California      | Case No. 13 CV 0328 BTM BLM
   corporation,
18
19          Plaintiff,                 | **DECLARATION OF
                                       | ILANA S. RUBEL IN SUPPORT
20     v.                              | OF DEFENDANTS' MOTION TO
                                       | DISMISS**
21 IWEB GROUP, INC., a Canadian
22 company d/b/a/ iWeb.com; IWEB       | Judge:   Hon. Barry Ted Moskowitz
   INTELLECTUAL PROPERTY, INC., a      | Court:   15B
23 Canadian company d/b/a iWeb.com;    | Date:    May 31, 2013
   IWEB TECHNOLOGIES, INC., a          | Time:    11:00 A.M.
24 Canadian company d/b/a/ iWeb.com; and
25 DOES 1 through 100, inclusive
26          Defendants.                | NO ORAL ARGUMENT UNLESS
27                                     | REQUESTED BY COURT
28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

I, Ilana S. Rubel, declare pursuant to 28 U.S.C. § 1746 as follows:

1.     I am a partner in the law firm of Fenwick & West LLP, counsel for Defendants iWeb Group, Inc., iWeb Intellectual Property, Inc., and iWeb Technologies, Inc. (collectively "iWeb").   I have personal knowledge of all facts stated in this Declaration.  Where I have been informed of correspondence to which I was I was not a participant, William Shawn is separately authenticating that correspondence.

2.     I am informed that on April 17, 2013, my co-counsel, William Shawn, asked counsel for Plaintiff Perfect 10, Inc. ("Perfect 10") to explain the purported basis for Perfect 10 to allege in its complaint, contrary to the facts as conveyed by our client, that iWeb operates one or more data centers in San Diego, California. I am familiar with the response by Perfect 10's counsel on April 17, 2013 to William Shawn's inquiry with reference to a third party web page that supposedly was an "example of a third party website referencing iWeb's data center" in San Diego, California and in Rochdale, Massachusetts. Attached as **Exhibit A** is a copy of the April 17, 2013 email from Natalie Locke, Perfect 10's counsel, that I reviewed.

3.     I investigated the third party website to determine whether any of the information shown there was at all reliable. **Exhibit B** to this Declaration is a copy of the webpage that I reached by entering a URL provided by Perfect 10's counsel: http://www.sitespeedlab.com/isp/iweb+technologies/. I observed that the top of the webpage said "SiteSpeedLab BETA3 rel012i," and I understood the term "Beta" to have the standard meaning for software applications, referring to a test version aimed at finding bugs before the final release. I also observed that the bottom of the webpage displayed "© 2009 — 2011," suggesting that the webpage had not been updated or revised since sometime in 2011.

4.     The description at the top of the webpage said "ISP – Iweb Technologies" and further explained: "Many hosting providers do not unveil cities where their data centers are located. Use our maps to find the location of data

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

centers." I understood this to mean that the data for the Site Speed Lab maps are not necessarily provided by the companies that own and operate data centers. This appears to be corroborated by a disclaimer acknowledging that there is some "percentage error" in the methodology for identifying data centers. Above the disclaimer is an image of a map of much of North America, with markers over certain locations. These locations appear to correspond to a list displayed above the map, which has two items under the United States heading: "San Diego 15 websites" and "Rochdale 12 websites." Those 27 websites appear to be a fraction of a percent of the total number of websites listed.

5.     I determined that the words "Rochdale" and "San Diego" were links to other webpages, with the URLs http://www.sitespeedlab.com/city/rochdale-united+states/iweb+technologies/ and http://www.sitespeedlab.com/city/san+diego/iweb+technologies/ respectively. Attached as **Exhibit C** is a true and correct copy of the "Rochdale" webpage. Attached as **Exhibit D** is a true and correct copy of the "San Diego" webpage. Like the page shown in Exhibit B, the "Rochdale" and "San Diego" webpages said "SiteSpeedLab BETA3 rel012i" (which again I understood to refer to a test version) and "© 2009 — 2011" (from which I again inferred that the webpage was out of date). The "Rochdale" page listed twelve websites by domain name, while the "San Diego" page listed fifteen websites by domain name. I selected the first domain name shown on the "San Diego" page, expomangersante.com and saw a description that Site Speed Laboratory offers analysis of DNS Lookup speed & latency tests (ping) & Page Load speed for every website. Our analysis is based on data for May 24 2011. Since the first of July 2010 we carried out 21 tests from locations for the main page of this website, the last of which were made about 4553 hours ago.

6.     This again suggested that the website was unreliable and not current.

7.     The "Rochdale" and "San Diego" pages had no explanation of why or how the author decided that those domain names were associated with a data center in Rochdale, Massachusetts or in San Diego, California. I further looked through the sitespeedlab.com website for any explanation but found none. The closest explanation I found was on a webpage at the URL http://www.sitespeedlab.com/about/#how, which described Site Speed Lab's automated use of a "web crawler," a "special program called SiteSpeedBot to get up-to-date information about your website." I could find no description of any human review, quality control, or other process to verify the accuracy of the SiteSpeedLab data. Furthermore, under the heading "About the Site Speed Lab Project" was the description that "[c]urrently, we offer tools that help you analyze DNS problems, reduce latency and accelerate page load speed. More tools and services coming soon." I observed that a tool for reliably identifying locations of data centers was not expressly listed among Site Speed Lab's then-current tools.

8.     I looked at the sitespeedlab.com home page, a true and correct copy of which is attached as **Exhibit E**. The top of the home page is entitled "Website Performance Analytics Tools" and is followed by an input box next to a button labeled "Test URL." I input the first domain name listed on Exhibit D (the "San Diego" webpage), Expomangersante.com, and clicked on the Test URL button. Attached as **Exhibit F** is a true and correct copy of the resulting error page, suggesting that the Site Speed Lab website and tools are nonoperational.

9.     Having been unable to discern from the sitespeedlab.com website any explanation or indicia suggesting that its data center identifications are reliable, I attempted on April 18, 2013 to contact the administrator of the website at the listed email address, admin@indeep76.com. In my email to that address, I wrote: "Site Speed Lab has indicated that iWeb maintains a data center in San Diego.  We are puzzled by this, as iWeb is a Canadian entity that only maintains servers in Canada, and none in San Diego of which we are aware.  Could you indicate what Site Speed

3

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Lab's basis is for posting that iWeb has a data center in San Diego?" Attached as **Exhibit G** is a true and correct copy of my email to the Site Speed Lab administrator address. I received no response, suggesting that the website or the persons that ran it are no longer active.  I was unable to find any phone number at which I could contact any individual associated with this website.

10.     I understand that there are standard protocols and tools for querying databases of web domain name registrations and IP (Internet Protocol) addresses. I used the tools available at the website www.whois.domaintools.com to conduct additional investigation about Site Speed Lab. I looked up the registration for www.sitespeedlab.com. Attached as **Exhibit H** is a true and correct copy of the results from http://whois.domaintools.com/sitespeedlab.com, which showed the registrant as "BOGDAN ANDRIY" in Kiev, Ukraine.

11.     I also looked up some of the domain names listed on **Exhibit C**  (the "Rochdale" webpage) and **Exhibit D** (the "San Diego" webpage). I found information that associated some of the websites for those domain names with servers in Canada, while some of the websites did not appear to be associated with Canada or iWeb at all. For example, I looked up the server information for one of the domain names listed on **Exhibit D** (the "San Diego" webpage), gotlines.com. Attached as **Exhibit I** is a true and correct copy of the resulting server information, which indicates "iWeb Technologies Inc." with an IP address location in Montreal, Quebec. I checked the registration information for the listed IP address specifically, and found that it was assigned to iWeb in Montreal, Quebec. Attached as **Exhibit J** is a true and correct copy of the IP address information for 209.172.57.81 (http://whois.domaintools.com/209.172.57.81). As another example, I looked up the server information for another one of the domain names listed on **Exhibit D**, rokhshad.com. Attached as **Exhibit K** is a true and correct copy of the resulting server information, which indicates a company (Hetzner Online) other than iWeb, with an IP address location in Germany. I checked the registration information for

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the listed IP address specifically, and found that it was assigned to Hetzner Online in Germany. Attached as **Exhibit L** is a true and correct copy of the IP address information for 5.9.110.12 (http://whois.domaintools.com/5.9.110.12). Thus, website domain names that Site Speed Labs had for some reason associated with a supposed (but non-existent) iWeb data center in San Diego do not in fact appear to link to servers in San Diego.

12. On Friday April 19, 2013 I telephoned Ms. Locke and left a message asking whether Perfect 10 had any other basis for its allegation that iWeb maintains servers in California. I pointed out that my investigation indicated that Perfect 10's source, www.sitespeedlab.com, appeared to be a defunct website based in the Ukraine with no indication of reliable methodology, and that I do not consider this to be a sufficient basis for the allegation given our client's assurance that it operates no servers outside Canada. I asked that Perfect 10 either withdraw the allegation at issue so that iWeb need not incur legal expenses further litigating this issue, or that Perfect 10 at least agree to an extension for iWeb's response to the Complaint so that we could further debate whether this allegation should remain in the Complaint before it need be briefed.

13. I am informed that later that day, Ms. Locke responded to my co-counsel William Shawn as follows:

> The allegation that a third party site states that there is a data center in San Diego is accurate and valid. iWeb has had ample time to raise this issue in any event and we do not believe that there is any basis that the Monday filing deadline should be extended.

14. Attached as **Exhibit M** is a copy of the order granting in part and denying in part the defendants' motion to dismiss in *Perfect 10, Inc. v. Giganews, Inc.*, Civ. No. 11-07098 (C.D. Cal. Mar. 8, 2013) [Docket No. 97], which I retrieved from PACER.

15. Attached as **Exhibit N** is a copy of the order granting defendants' motion to change venue in *Perfect 10, Inc. v. Giganews, Inc.*, Civ. No. 11 -00905

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (S.D. Cal. Aug. 25, 2011) [Docket No. 56], which I retrieved from PACER.

2

3

4         I declare under penalty of perjury that the foregoing is true and correct.

5         Executed this 22nd day of April 2013.

6                                              */s/ Ilana S. Rubel*
                                               Ilana S. Rubel
7

8    LIT/1356468.3

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS OF EXHIBITS
## TO DECLARATION OF ILANA S. RUBEL
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**Page(s)**

Exhibit A: April 17, 2013 email from Natalie Locke ................................................ 1

Exhibit B: Webpage from Perfect 10 counsel .......................................................... 2

Exhibit C: Rochdale webpage ................................................................................... 3

Exhibit D: San Diego wepages ................................................................................. 4

Exhibit E: Website Performance Analytics Tools .................................................. 5-6

Exhibit F: Error Page ................................................................................................ 7

Exhibit G: Email to Site Speed Lab ......................................................................... 8

Exhibit H: Results from sitespeedlab.com ........................................................... 9-10

Exhibit I: Server information from iWeb Technologies .................................... 11-12

Exhibit J: IP address information for 209.172.57.81 ........................................ 13-14

Exhibit K: Server information ........................................................................... 15-16

Exhibit L: IP address information for 5.9.110.12 .................................................. 17

Exhibit M: Court Order *Perfect 10, Inc. v. Giganews, Inc.*, Civ. No. 11- 07098 (C.D. Cal. Mar. 8, 2013) [Docket No. 97] ...................................................... 18-41

Exhibit N: Court Order *Perfect 10, Inc. v. Giganews, Inc.*, Civ. No. 11-CV-00905 (S.D. Cal. Aug. 25, 2011) [Docket No. 56] .................................................... 42-47

# EXHIBIT A

**From:** "Natalie H. Locke, Esq." <natalie@perfect10.com>
**Date:** April 17, 2013, 7:13:16 PM EDT
**To:** 'William Shawn' <WShawn@shawncoulson.com>, 'Eric Benink' <Eric@kkbs-law.com>
**Cc:** "Natalie H. Locke Esq." <natalie@perfect10.com>
**Subject: RE: iWeb/Perfect 10 adv/Complaint Issue/Data Center Allegations Our Ref. No. 9270.04**

Dear Mr. Shawn,

Thank you for your email.  Attached please find an example of a third party website referencing iWeb's data center in San Diego.  This website, sitespeedlab.com, also refers to an iWeb data center in Rochdale, Massachusetts.

Best regards,

**Natalie H. Locke, Esq.** | **Perfect 10, Inc.** | natalie@perfect10.com

This e-mail may be confidential or may contain information which is protected by the attorney-client privilege and work product doctrine, as well as other privileges. If you are not the intended recipient of this e-mail, any dissemination or copying of this message is strictly prohibited. Anyone who mistakenly receives this e-mail should notify the sender immediately by telephone or return e-mail and delete it from his or her computer.

**From:** William Shawn [mailto:WShawn@shawncoulson.com]
**Sent:** Wednesday, April 17, 2013 8:52 AM
**To:** 'Eric Benink'; 'Natalie H. Locke, Esq.'
**Subject:** iWeb/Perfect 10 adv/Complaint Issue/Data Center Allegations Our Ref. No. 9270.04

Dear Mr. Benink and Ms. Locke: Perfect 10's complaint alleges, in part, "[t]hird party websites state that iWeb has a data center in San Diego, California…."; however, iWeb has never had any such data center in San Diego or anywhere in the United States. Despite much effort, we have been unable to find any such references anywhere on the Internet to understand the basis for the foregoing allegation.

If you have any website references to an iWeb data center in San Diego, we would appreciate seeing the references at your earliest convenience so we can ensure the record in this action is correct, and avoid dealing with incorrect matter in our forthcoming response. If the allegation was made in error, we would appreciate your agreement today to drop the allegation, through a stipulation, as we did with the New Dream Network allegations earlier, so we can timely file iWeb's response. Cordially, William Shawn

# EXHIBIT B

SiteSpeedLab BETA3 rel013

## ISP - Iweb Technologies

This list contains the names of cities where the hosting provider has its own data centers. Click on the marker to get the list of the websites that are hosted in that city.

**When this list is useful for you?** For example, you are choosing a hosting provider for the website in Germany with German audience. Using our data, you can choose a location with good latency for your website. Many hosting providers do not unveil cities where their data centers are located. Use our maps to find the location of data centers.

**Canada**
Montreal 3,599 websites
Mississauga 19 websites
Toronto 16 websites

**United States**
San Diego 15 websites
Rochdale 12 websites



We do not display the map and the list of the countries and cities where the number of the websites for this hosting provider is less than 0.01%, because our base has the same percentage error.



**Check Page Speed**

http://
Test URL

**Our website**
Site Speed Lab
About Our Site
How do we test?
Remove your site
Crawler restrictions
Our capacities
Widgets new
Our W3C Translations

Like 0

**Sitemaps**
by Country, City ▼
by Domains ▼
by Hosting ▼

**Some facts about** Site Speed

What Google says about website speed
    Website speed is really important. Google considers speed as a competitive advantage now

Website Speed and SEO
    Website speed is one of the ranking factors. It means you can get more chances to get into TOP-10 of search results page if you make your website more faster

Website speed impacts revenue
    Improve website performance to get more page views, search queries per user and more revenue

Website Speed and User's Experience
    You can improve the user experience of your website by optimizing performance

How to make your website fast?
    Simple tips that help you make your website faster

Search

admin@indeep76.com  © 2009 — 2011 SiteSpeedLab & SiteSpeedLab.com
Be Quick or Be Dead

# EXHIBIT C

SiteSpeedLab - Sitemaps - Websites hosted at Iweb Technologies, Rochdale, US: Lavabla...   Page 1 of 1

SiteSpeedLab BETA3 rel012)

**Websites hosted at United states, Rochdale, Webhosting:Iweb Technologies**

| # | Domain | PageSpeed | Latency | DNS Lookup |
|---|--------|-----------|---------|------------|
| 1 | Lavablast.com | 108.84 Kb/s | **55 ms**<br>to 64.15.152.228 | **111 ms**<br>from my.privatedns.com |
| 2 | Foundationphp.com | 104.11 Kb/s | **55 ms**<br>to 64.15.152.18 | **87 ms**<br>from ns1.gettingstart... |
| 3 | Forrentonline.net | 103.66 Kb/s | **36 ms**<br>59% packet loss<br>to 64.15.152.72 | **281 ms**<br>from ns.clickhost.net |
| 4 | Tvpassport.com | 72.26 Kb/s | **56 ms**<br>to 64.15.152.190 | **195 ms**<br>from ns1.tvmedia.ca |
| 5 | Freehomepage.com | 66.42 Kb/s | **56 ms**<br>to 64.15.152.16 | **139 ms**<br>from ns1.sj1.northsky.com |
| 6 | Limboclub.com | 35.09 Kb/s | **37 ms**<br>20% packet loss<br>to 64.15.152.19 | **101 ms**<br>from ns13.zoneedit.com |
| 7 | Ourlovecalculator.com | 23.67 Kb/s | **25 ms**<br>66% packet loss<br>to 64.15.152.239 | **85 ms**<br>from my.privatedns.com |
| 8 | Singpolyma.net | 16.55 Kb/s | **57 ms**<br>to 64.15.152.44 | **87 ms**<br>from fay.ns.cloudflar... |
| 9 | Mobularity.com | 14.98 Kb/s | **39 ms**<br>83% packet loss<br>to 64.15.152.239 | **79 ms**<br>from my.privatedns.com |
| 10 | Mylovercalculator.com | 12.56 Kb/s | **37 ms**<br>26% packet loss<br>to 64.15.152.239 | **83 ms**<br>from my.privatedns.com |
| 11 | Luvrating.net | 0.00 Kb/s | **25 ms**<br>83% packet loss<br>to 64.15.152.239 | **119 ms**<br>from my.privatedns.com |
| 12 | Getyourcrush.com | 0.00 Kb/s | **62 ms**<br>24% packet loss<br>to 64.15.152.239 | **117 ms**<br>from my.privatedns.com |
| # | Domain | PageSpeed | Latency | DNS Lookup |

**Check Page Speed**

 Like 0

http://

Test URL

**Our website**
Site Speed Lab
About Our Site
How do we test?
Remove your site
Crawler restrictions
Our capacities
Widgets new
Our W3C Translations



**Sitemaps**
by Country, City ▼
by Domains ▼
by Hosting ▼

**Some facts about** Site Speed
What Google says about website speed
   Website speed is really important. Google considers speed as a competitive advantage now
Website speed and SEO
   Website speed is one of the ranking factors. It means you can get more chances to get into TOP-10 of
   search results page if you make your website more faster
Website speed impacts revenue
   Improve website performance to get more page views, search queries per user and more revenue
Website Speed and User's Experience
   You can improve the user experience of your website by optimizing performance
How to make your website fast?
   Simple tips that help you make your website faster

Search

admin@indeep76.com  © 2009 — 2011 SiteSpeedLab & SiteSpeedLab.com
Be Quick or Be Dead

# EXHIBIT D

SiteSpeedLab - Sitemaps - Websites hosted at Iweb Technologies, San Diego, US: Expo...   Page 1 of 1



SiteSpeedLab BETA3 rel01

**Websites hosted at United states, San Diego, Webhosting:Iweb Technologies**

| # | Domain | PageSpeed | Latency | DNS Lookup |
|---|--------|-----------|---------|------------|
| 1 | Expomangersante.com | 1.12 Mb/s | 56 ms<br>to 209.172.57.77 | 184 ms<br>from ns1.expomangersa... |
| 2 | Xsilva.com | 346.26 Kb/s | 57 ms<br>13% packet loss<br>to 209.172.57.229 | 98 ms<br>from ns1.mydyndns.org |
| 3 | Bahagon.com | 184.01 Kb/s | 56 ms<br>to 209.172.57.54 | 141 ms<br>from ns13.zoneedit.com |
| 4 | Fairlive.ir | 143.71 Kb/s | 25 ms<br>50% packet loss<br>to 209.172.57.90 | 1847 ms<br>from ns21.persiantool... |
| 5 | Psycho-ressources.com | 139.53 Kb/s | 55 ms<br>to 209.172.57.19 | 113 ms<br>from my.privatedns.com |
| 6 | Shotsdaily.com | 108.49 Kb/s | —<br>75% packet loss<br>to 209.172.57.90 | 155 ms<br>from host225193.earth... |
| 7 | Tagcloud.com | 78.96 Kb/s | 56 ms<br>to 209.172.57.199 | 70 ms<br>from ns.rackspace.com |
| 8 | Tafrihi.ir | 77.18 Kb/s | 17 ms<br>59% packet loss<br>to 209.172.57.90 | 173 ms<br>from ns21.persiantool... |
| 9 | Anfashion.com | 75.01 Kb/s | 13 ms<br>58% packet loss<br>to 209.172.57.92 | 137 ms<br>from ns1.anfashion.com |
| 10 | Rokhshad.com | 73.09 Kb/s | —<br>75% packet loss<br>to 209.172.57.237 | 120 ms<br>from ns1.nvasil.com |
| 11 | Tafrihi.com | 71.86 Kb/s | 56 ms<br>49% packet loss<br>to 209.172.57.90 | 141 ms<br>from ns21.persiantool... |
| 12 | Charactell.com | 71.73 Kb/s | 56 ms<br>to 209.172.57.251 | 123 ms<br>from ns55.worldnic.com |
| 13 | Gotlines.com | 46.59 Kb/s | 59 ms<br>to 209.172.57.81 | 93 ms<br>from ns.gotlines.com |
| 14 | Parasol2000.com | 0.00 Kb/s | 56 ms<br>to 209.172.57.77 | 119 ms<br>from ns1.parasol2000.com |
| 15 | Loveme.net.au | 0.00 Kb/s | 56 ms<br>to 209.172.57.248 | 401 ms<br>from ns1.imperiata.com |
| # | Domain | PageSpeed | Latency | DNS Lookup |

**Check Page Speed**

Test URL

**Our website**
Site Speed Lab
About Our Site
How do we test?
Remove your site
Crawler restrictions
Our capacities
Widgets new
Our W3C Translations

☀ Like 0

**Sitemaps**
by Country, City ▾
by Domains ▾
by Hosting ▾

**Some facts about Site Speed**

**What Google says about website speed**
Website speed is really important. Google considers speed as a competitive advantage now

**Website Speed and SEO**
Website speed is one of the ranking factors. It means you can get more chances to get into TOP-10 of search results page if you make your website more faster

**Website speed impacts revenue**
Improve website performance to get more page views, search queries per user and more revenue

**Website Speed and User's Experience**
You can improve the user experience of your website by optimizing performance

**How to make your website fast?**
Simple tips that help you make your website faster

Search

admin@indesp76.com  © 2009 — 2011 SiteSpeedLab & SiteSpeedLab.com
Be Quick or Be Dead

http://www.sitespeedlab.com/city/san+diego/iweb+technologies/                    4/21/2013

**Exh._D**
**Page 4**

# EXHIBIT E

SiteSpeedLab _Beta_                                          [ Search ]

## Website Performance Analytics Tools

Thousands of webmasters and developers use our performance
tools to monitor and improve website performance, speed up page
load, reduce bounce rate and increase website's revenue. Our
tests and measurements are accurate because we have extensive
experience in network technologies. We also have a solid
infrastructure: 5 testing servers in 4 countries. With our help you'll
make your website faster.

 http://Expomangersante.com   [ Test URL ]



See Online Demo for _Playhub.com_

## Speed Does Matter

**Google says website speed is a ranking factor now.**
This means that if your website is faster than your competitors, you'll be able to overtake them and get higher position in SERPs. And, that means
you'll get more visitors to your website and more potential clients. So, even though it's just one of the approximately **200** factors that search engines
use to rank websites - there is no reason to ignore it.

**High Website Speed Reduces the Bounce Rate**
High website performance and especially rapid opening of the page (when user can see the content of the page literally at the same second of
clicking on the link) significantly reduces the level of the bounce rate. This in turn has a positive effect on the external website evaluation factors.

**Increase your website's revenue by optimizing page load time.**
When a website loads quickly, the bounce rate decreases. This, in turn, increases the number of page views per visitor, the number of ad
impressions, the number of searches on the site and the number of sales.

## Site Speed Laboratory Tools

**DNS Lookup Speed**
When a user visits a website, the browser resolves the DNS for the IP where your website is located. DNS resolutions can take from a few
milliseconds to several seconds and can be a major cause of slow page loads.

**Website Latency**
A browser often needs to download up to 100 objects (stylesheets, images, videos, javascripts) to show a web page to users. The browser creates a
separate request for each object it needs to download. So, there could be hundreds of requests. Each request requires a time. Page load speed
depends on website latency, geographical distance between the user and server and speed of processing of requests.

**Page Load Speed**
It's the most important and comprehensive of the tools. It shows an overall picture of the website. We are constantly improving this tool. It shows not
only website speed and analysis of competitors, but also provides tips that help you improve loading speed of your website.

**Milestones**
Milestone is one of the most important events of the site. By milestone we understand changing the website's hosting provider or transferring to a
new server. We take into account the changes that occurred after the move. This data helps webmasters to evaluate how website performance has
changed - latency, DNS lookup, etc. In other words, the webmaster can understand if it has become worse over time or better over time.

## Site Speed Laboratory Widgets

SiteSpeedLab offers widgets for free. Webmasters and site owners can install on their websites widgets that show the results of recent tests of website speed.

**PageSpeed Widget**
PageSpeed Widget displays page loading speed. If you install this widget, you can always monitor website performance. Make your website fast and
reliable.

**DNS Lookup Widget**
DNS Lookup Widget helps you monitor the speed of domain resolving.

**Latency Test Widget.**
We recommend you install this widget on your site, so you can quickly know the latency to your website measured by testing servers around the
world.

## How Do We Test?

**Our Ideology**
Obtaining adequate and accurate data, analysis and comparison is what we do best. Data acquisition for websites from the same location is
executed at the same time, and the frequency of measurements dimensioned to seconds. Our task is not only to measure the speed but also to
impose adequate data on the audience of your website. That's why we use 5 different servers around the world.

**Our capacities**
To obtain the most useful statistical data, we currently use
the following servers:
🇺🇸 **Usa**, NY, New York



Usa, lorida, Tampa
Germany, rankfurt
anada, Montreal
United ingdom, loucester

**heck Page Speed**

http://

Test RL

**Our website**

Site Speed Lab
About Our Site
How do we test
Remove your site
rawler restrictions
Our capacities
Widgets new
Our W Translations

Like 6

**Sitemaps**

by ountry ity
by Domains
by Hosting

**Some facts about Site**

**What Google says about web**
Website speed is really important. oogle considers speed as a competitive advantage now

**Website Speed and S O**
Website speed is one of the ranking factors. It means you can get more chances to get into TOP-10 of
search results page if you make your website more faster

**Website speed impacts revenue**
Improve website performance to get more page views, search queries per user and more revenue

**Website Speed and User's perience**
You can improve the user experience of your website by optimi ing performance

**How to make your website fast**
Simple tips that help you make your website faster

Search

admin@indeep76.com   00   011 SiteSpeedLab   SiteSpeedLab.com
Be uick or Be Dead

# EXHIBIT F

# 504 Gateway Time-out

---

nginx

# EXHIBIT G

**From:** Ilana Rubel
**Sent:** Thursday, April 18, 2013 7:08 AM
**To:** 'admin@indeep76.com'
**Subject:** iWeb servers
**Importance:** High

Dear Site Speed Lab Administrator –
It has come to our attention that at the following site-
http://www.sitespeedlab.com/isp/iweb+technologies/ - Site Speed Lab has indicated that iWeb
maintains a data center in San Diego.  We are puzzled by this, as iWeb is a Canadian entity that only
maintains servers in Canada, and none in San Diego of which we are aware.  Could you indicate what
Site Speed Lab's basis is for posting that iWeb has a data center in San Diego?  This is of some urgency to
resolve quickly, for reasons I can explain, so your prompt attention to this is greatly appreciated.   If
there is a phone number where you can be reached, please advise. Thank you very much.

Regards,
Ilana Rubel
(650) 335-7208

# EXHIBIT H

SiteSpeedLab.com - SiteSpeedLab - Speed Does Matter                                      Page 1 of 2



Open a FREE Account | Log in | Help

| sitespeedlabs.com | Whois Search ▼ | Search |

.

More Domains
Reverse Whois
History Details
Get Notified
Trademark Monitor
Screenshot History

Whois > SiteSpeedLab.com

Tweet    Like   5.3k

### SiteSpeedLab.com Whois Record

Ads by Google

Google Apps for Business Save Your Business Time, Money, and Hassles. Free 30 Day Trial. www.google.com/apps/business

2013's Free Dating Sites Our Official Results In! Find 5 Dating Sites w/ Free Sign Up www.consumer-rankings.com/Dating

File Your DBA Online Get Your DBA Now - 3 Easy Steps. No Questionnaire. No Obligation. LegalZoom.com

$0.99 Domains at Go Daddy Why Pay More? Compare Us! Free Hosting w/Site Builder & More. GoDaddy.com

Online Consumer Survey Complete our online survey today to qualify for free coupons & samples. www.shoppers-voice.com

Ads by Google

**Socalweb - We Love Linux.**
Comprehensive Managed Linux Hosting 24/7 Expert Support - 100% Uptime
www.socalweb.com

**MDG - Laptop Financing**
Finance A New Top Laptop @ 79¢/day Get Free Tablet. Everyone Approved.
www.mdg.com

**School Grants For Moms**
Go Back To School Online. Moms May Qualify For Grants To Start School!
online-school.classesandcareers.com

**Win $5000-Fill Out Survey**
Win Up To $5,000 For Your Opinion! Take Our Survey & Earn Cash Prizes
i-Say.com/Win_$5000_Cash

**Build An Commerce Site**
Build Your Online Store in Minutes. Award Winning 24/7 Support!
Squarespace.com/Commerce

**Network UPS Systems**
Power Protection for All Equipment. 300-160kVA UPS Systems. In stock!
tripplite.com/UPS

**Dating Again & Over 40?**
Do You Want To Meet Professional Santa Rosa Singles? Join Now!
MatureProfessionalS ingles.net

**Free 1600 Microsoft Points**

Whois Record    Site Profile    Registration    Server Stats    For Sale

**Whois Record**

Reverse Whois: "Deeptown" owns about 36 other domains
Email Search: support@namecheap.com is associated with about 2,577,723 domains
db76poot4@gmail.com is associated with about 36 domains
Registrar History: 1 registrar
NS History: 1 change on 2 unique name servers over 3 years.
IP History: 6 changes on 4 unique IP addresses over 3 years.
Whois History: 78 records have been archived since 2010-04-17 .
Reverse IP: 3 other sites hosted on this server.

Log In or Create a FREE account to start monitoring this domain name

Preview the complete Domain Report for sitespeedlab.com

**DomainTools for Windows®**
Now you can access domain ownership records ... from your own desktop!
Download Now>



Registration Service Provided By: Namecheap.com
Contact: support@namecheap.com
Visit: http://namecheap.com
Domain name: sitespeedlab.com

Registrant Contact:
   Deeptown
   BOGDAN ANDRIY ()
   Fax:
   CHERNOBILSKAYA
   11a kv.85
   Kiev, P 03179
   UA

Administrative Contact:
   Deeptown
   BOGDAN ANDRIY (db76poot4@gmail.com)
   +1.5555555555
   Fax: +1.5555555555
   CHERNOBILSKAYA
   11a kv.85
   Kiev, P 03179
   UA

Technical Contact:
   Deeptown
   BOGDAN ANDRIY (db76poot4@gmail.com)
   +1.5555555555
   Fax: +1.5555555555
   CHERNOBILSKAYA
   11a kv.85
   Kiev, P 03179
   UA

Status: Locked

Name Servers:
   dns1.registrar-servers.com



Website Performance Analytics Tools

Image Supplied By DomainTools.com



DTCN13A .CN
ONLY 39.99/YEAR



DOMAININDEX.COM
APPRAISE THIS DOMAIN FOR ME

Country TLDs    General TLDs

Available domains for registration:

| | | |
|---|---|---|
| SiteSpeedLab.at | | Register |
| SiteSpeedLab.be | | Register |
| SiteSpeedLab.ch | | Register |
| SiteSpeedLab.co.uk | | Register |
| SiteSpeedLab.de | | Register |
| SiteSpeedLab.es | | Register |
| SiteSpeedLab.eu | | Register |
| SiteSpeedLab.fr | | Register |
| SiteSpeedLab.in | | Register |
| SiteSpeedLab.it | | Register |

Register All Selected >    Show all (16) >

SiteSpeedLab.com - SiteSpeedLab - Speed Does Matter                    Page 2 of 2

Search multiple
engines for free 1600
microsoft points
www.webcrawler.com

**Free Webpage in
Minutes**

Create Your Own
Website Using Our
Easy Website Builder.
100% Free!
Webs.com/Free

```
dns .registrar-servers.com
dns3.registrar-servers.com

Creation date: 1  Apr  010 08:  :00
Expiration date: 1  Apr  01  07:  :
```

Backorder this domain or Hire a domain broker

Whois Directory

a b c d e f g h i_ k l m n o p q r s t u v w x y_ 0 1 2 3 4 5 6 _ 9

### Promote your website

www. oogle.com/  d   ords

each more c  stomers with   d   ords Start ad  ertising with  oogle toda



AdChoices ▷

Memberships | Developer API | About Us | Blog | Desktop Tools | Terms of Service | Privacy | Support | oin Our Team | Contact Us | Press | Site Map

**2013 DomainTools, LL**    All rights reserved.



**Exh._H**
**Page 10**

# EXHIBIT I

GotLines.com - Pick Up Lines                                         Page 1 of 2



Open a FREE Account | Log in | Help

expomangersante.com    Whois Search ▼    Search

More Domains
Reverse Whois
History Details
Get Notified
Trademark Monitor
Screenshot History

Whois > GotLines.com

### GotLines.com Whois Record

Ads by Google

$0.99 Domains at Go Daddy Why Pay More? Compare Us! Free Hosting w/Site Builder & More. GoDaddy.com

File Your DBA Online Get Your DBA Now - 3 Easy Steps. Free Questionnaire. No Obligation. LegalZoom.com

Online Consumer Survey Complete our online survey today to qualify for free coupons & samples. www.shoppers-voice.com

Web Design Psd Award Winning 24/7 Support. Build Your Online Store in Minutes. Squarespace/Commerce

2013's Free Dating Sites Our Official Results Are In! Find 5 Dating Sites w/ Free Sign Up www.consumer-rankings.com/Dating

Ads by Google
Customer
Feedback
Survey?

Justellus gives you an
easier way to provide
brand feedback
quickly.
Justellus.com

Fill Out Surveys
and Win

Free Online Surveys –
Earn rewards! Sign up
for Sweepstakes &
Giveaways
www.i-say.com

New Car Prices

Don't pay MSRP! Find
our Lowest Price on a
New 2013 Vehicle.
New.CarPriceSecrets
.com

God Really Does
Love You

Discover God's Love
and Forgiveness He
Wants You to Know
Him Too
JesusOnline.com/
Discover_God

School Grants For
Moms

Go Back To School
Online. Moms May
Qualify For Grants To
Start School!
online-
school.classesandcareers.com

Business Website
Hosting

Secure Hosting for
Businesses. 24/7/365
Support. Learn More
Today!
www.INetU.net/
WebsiteHosting

Pretty Ukraine
Ladies

Ukrainian girls and
women are looking for
dating with foreign
men
Online-Dating-
Ukraine.com/Ladies

Whois Record    Site Profile    Registration    Server Stats    For Sale

#### Server Data

Server Type: Apache
IP Address: 67.205.85.229    Reverse-IP | Ping | DNS Lookup | Traceroute
Whois Server: whois.godaddy.com
ASN: AS32613 IWEB-AS - iWeb Technologies Inc. (registered Jun 15, 2004)
IP Location: - Quebec - Montreal - Iweb Dedicated CI
Response Code: 200
Domain Status: Registered And Active Website



GotLines Pick-Up Lines

Image Supplied By DomainTools.com

euroms DTRU13A .RU
ONLY 10.99EUR
New + Transfer until 30/06/2013

What's the value of this domain?
FIND OUT WHAT IT'S WORTH AT
DOMAININDEX.COM

Country TLDs    General TLDs

Available domains for registration:

| | | |
|---|---|---|
| GotLines.at | | Register |
| GotLines.be | | Register |
| GotLines.ch | | Register |
| GotLines.co.uk | | Register |
| GotLines.de | | Register |
| GotLines.dk | | Register |
| GotLines.es | | Register |
| GotLines.in | | Register |
| GotLines.it | | Register |
| GotLines.jp | | Register |

Register All Selected >        Show all (15) >

Whois Directory

a b c d e f g h i j k l m n o p q r s t u v w x y z 0 1 2 3 4 5 6 7 8 9

Exh._I
Page 11

GotLines.com - Pick Up Lines                                          Page 2 of 2

Concealed Carry
Info

Do You Know Your
Rights? Get Your Free
Concealed Carry
Report Today.
USConcealedCarry.net



Free Chat w/ Fun
Singles

Call Now to speak with
Real Singles in your
area. Try it for Free!
www.QuestChat.com

**2013 DomainTools, LLC** All rights reserved.



# EXHIBIT J





gotlines.com    Whois Search ▾    Search

.

## IP Information for 67.205.85.229

| | | |
|---|---|---|
| **IP Location:** | | Canada Montreal Iweb Dedicated Cl |
| **ASN:** | | AS32613 IWEB-AS - iWeb Technologies Inc. (registered Jun 15, 2004) |
| **IP Address:** | 67.205.85.229 | W R P D T |
| **Whois Server** | whois.arin.net | |
| **Reverse IP:** | 19 websites use this address. (examples: buylondon.ca curemyhangover.com dirtme.com diklonez.com) | |

```
NetRange:       67.205.64.0 - 67.205.127.255
CIDR:           67.205.64.0/18
OriginAS:       AS32613
NetName:        IWEB-BLK-04
NetHandle:      NET-67-205-64-0-1
Parent:         NET-67-0-0-0-0
NetType:        Direct Allocation
Comment:        Please use abuse@noc.privatedns.com for abuse issues.
RegDate:        2007-11-15
Updated:        2012-02-24
Ref:            http://whois.arin.net/rest/net/NET-67-205-64-0-1

OrgName:        iWeb Technologies Inc.
OrgId:          GIT-20
Address:        20, place du Commerce
City:           Montreal
StateProv:      QC
PostalCode:     H3E-1Z6
Country:        CA
RegDate:        2003-11-06
Updated:        2008-10-04
Comment:        http://www.iweb.com
Ref:            http://whois.arin.net/rest/org/GIT-20

OrgTechHandle: NETWO2356-ARIN
OrgTechName:   Network Administrator
OrgTechPhone:  +1-514-286-4242
OrgTechEmail:  net-admin@noc.privatedns.com
OrgTechRef:    http://whois.arin.net/rest/poc/NETWO2356-ARIN

OrgNOCHandle: NETWO2356-ARIN
OrgNOCName:   Network Administrator
OrgNOCPhone:  +1-514-286-4242
OrgNOCEmail:  net-admin@noc.privatedns.com
OrgNOCRef:    http://whois.arin.net/rest/poc/NETWO2356-ARIN

OrgAbuseHandle: ABUSE1906-ARIN
OrgAbuseName:   Abuse Coordinator
OrgAbusePhone:  +1-514-286-4242
OrgAbuseEmail:  abuse@noc.privatedns.com
OrgAbuseRef:    http://whois.arin.net/rest/poc/ABUSE1906-ARIN

NetRange:       67.205.85.224 - 67.205.85.255
CIDR:           67.205.85.224/27
OriginAS:       AS32613
NetName:        IWEB-CL-T066-02SH
NetHandle:      NET-67-205-85-224-1
Parent:         NET-67-205-64-0-1
NetType:        Reassigned
RegDate:        2008-03-27
Updated:        2008-04-02
Ref:            http://whois.arin.net/rest/net/NET-67-205-85-224-1

CustName:       iWeb Dedicated CL
Address:        5945, Couture
City:           St-Leonard
StateProv:      QC
PostalCode:     H1P-1A8
Country:        CA
RegDate:        2008-03-27
Updated:        2011-03-19
Ref:            http://whois.arin.net/rest/customer/C01912467
```

**Exh._J**
**Page 13**

67.205.85.229 IP Address WHOIS | DomainTools.com                    Page 2 of 2

```
OrgTechHandle: NETWO2356-ARIN
OrgTechName:   Network Administrator
OrgTechPhone:  +1-514-286-4242
OrgTechEmail:  net-admin@noc.privatedns.com
OrgTechRef:    http://whois.arin.net/rest/poc/NETWO2356-ARIN

OrgNOCHandle: NETWO2356-ARIN
OrgNOCName:   Network Administrator
OrgNOCPhone:  +1-514-286-4242
OrgNOCEmail:  net-admin@noc.privatedns.com
OrgNOCRef:    http://whois.arin.net/rest/poc/NETWO2356-ARIN

OrgAbuseHandle: ABUSE1906-ARIN
OrgAbuseName:   Abuse Coordinator
OrgAbusePhone:  +1-514-286-4242
OrgAbuseEmail:  abuse@noc.privatedns.com
OrgAbuseRef:    http://whois.arin.net/rest/poc/ABUSE1906-ARIN
```

Mem erships | e eloper | o t s | log | es top ools | erms o Ser ice | ri ac | S pport | oin r eam | ontact s | ress | Site Map

20   omain oo        ll rights reser ed.



**Exh._J**
**Page 14**

# EXHIBIT K

RoKhShad.com - شاد خر ROKHSHAD                                      Page 1 of 2



Open a FREE Account | Log in | Help

gotlines.com    Whois Search ▾    Search

Whois > RoKhShad.com

## RoKhShad.com Whois Record

Tweet    Like    5.3k

Whois Record    Site Profile    Registration    **Server Stats**    For Sale

More Domains
Reverse Whois
History Details
Get Notified
Trademark Monitor
Screenshot History

### Server Data

| | |
|---|---|
| Server Type: | nginx |
| IP Address: | 5.9.110.12   Reverse-IP | Ping | DNS Lookup | Traceroute |
| Whois Server: | whois.publicdomainregistry.com |
| ASN: | AS24940 HETZNER-AS Hetzner Online AG (registered Jun 03, 2002) |
| IP Location: | - Bayern - Nuremberg - Hetzner Online Ag |
| Response Code: | 200 |
| Domain Status: | Registered And Active Website |



Image Supplied By DomainTools.com

eurodns DTRU13A .RU
ONLY 10.99EUR
New + Transfer until 30/06/2013

What's This Domain Worth?
FIND OUT AT
DOMAININDEX.COM

**Country TLDs**    General TLDs

Available domains for registration:

| | |
|---|---|
| ☐ RoKhShad .at | Register |
| ☐ RoKhShad .be | Register |
| ☐ RoKhShad .ch | Register |
| ☐ RoKhShad .cn | Register |
| ☐ RoKhShad .co.uk | Register |
| ☐ RoKhShad .de | Register |
| ☐ RoKhShad .dk | Register |
| ☐ RoKhShad .es | Register |
| ☐ RoKhShad .eu | Register |
| ☐ RoKhShad .fr | Register |

**Register All Selected >**    Show all (18) >

Whois Directory

a b c d e f g h i j k l m n o p q r s t u v w x y z 0 1 2 3 4 5 6 7 8 9

http://whois.domaintools.com/rokhshad.com                    4/21/2013

**Exh._K**
**Page 15**

RoKhShad.com - ‏رخ شاد‎ ROKHSHAD                                    Page 2 of 2

© 2013 DomainTools, LLC All rights reserved.



**Exh._K**
**Page 16**

# EXHIBIT L

5.9.110.12/rivas.rivasit.com IP Address WHOIS | DomainTools.com                    Page 1 of 1



Open a FREE Account | Log in | Help

| rokhshad.com | Whois Search ▾ | Search |

.

## IP Information for 5.9.110.12

| | |
|---|---|
| **IP Location:** | Germany Nuremberg Hetzner Online Ag |
| **ASN:** | AS24940 HETZNER-AS Hetzner Online AG (registered Jun 03, 2002) |
| **Resolve Host:** | rivas.rivasit.com |
| **IP Address:** | 5.9.110.12  W R P D T |
| **Whois Server** | whois.ripe.net |
| **Reverse IP:** | 52 websites use this address. (examples: 118gilan.com  abarsamane.ir  abc-co.org  abrizeh.ir) |

```
inetnum:        5.9.110.0 - 5.9.110.31
netname:        HETZNER-RZ16
descr:          Hetzner Online AG
descr:          Datacenter 16
country:        DE
admin-c:        HOAC1-RIPE
tech-c:         HOAC1-RIPE
status:         ASSIGNED PA
remarks:        INFRA-AW
mnt-by:         HOS-GUN
mnt-lower:      HOS-GUN
mnt-routes:     HOS-GUN
source:         RIPE # Filtered

role:           Hetzner Online AG - Contact Role
address:        Hetzner Online AG
address:        Stuttgarter Strasse 1
address:        D-91710 Gunzenhausen
address:        Germany
phone:          +49 9831 61 00 61
fax-no:         +49 9831 61 00 62
abuse-mailbox:  abuse@hetzner.de
remarks:        ************************************************
remarks:        * For spam/abuse/security issues please contact *
remarks:        *   abuse@hetzner.de, not this address.         *
remarks:        *   The contents of your abuse email will be    *
remarks:        *   forwarded directly on to our client for     *
remarks:        *   handling.                                   *
remarks:        ************************************************
remarks:
remarks:        ************************************************
remarks:        *   Any questions on Peering please send to     *
remarks:        *   peering@hetzner.de                          *
remarks:        ************************************************
org:            ORG-HOA1-RIPE
admin-c:        MH375-RIPE
tech-c:         GM834-RIPE
tech-c:         SK2374-RIPE
tech-c:         TF2013-RIPE
tech-c:         MF1400-RIPE
tech-c:         SK8441-RIPE
nic-hdl:        HOAC1-RIPE
mnt-by:         HOS-GUN
source:         RIPE # Filtered

route:          5.9.0.0/16
descr:          HETZNER-RZ-FKS-BLK5
origin:         AS24940
mnt-by:         HOS-GUN
source:         RIPE # Filtered
```

Memberships | Developer API | About Us | Blog | Desktop Tools | Terms of Service | Privacy | Support | Join Our Team | Contact Us | Press | Site Map

© 2013 DomainTools, LLC All rights reserved.



http://whois.domaintools.com/5.9.110.12                                        4/21/2013

**Exh._L**
**Page 17**

# EXHIBIT M

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | | |

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE | |
|---|---|---|
| Stephen Montes | Not Reported | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|

**Proceedings:**      IN CHAMBERS (No Proceedings Held)

Plaintiff Perfect 10, Inc., has brought this action against Defendants Giganews, Inc., and Livewire Services, Inc., for infringing upon Plaintiff's various intellectual property rights. The Complaint alleges claims for (1) direct, contributory, and vicarious copyright infringement, (2) direct, contributory, and vicarious trademark infringement, (3) trademark dilution, (4) violation of California's Unfair Competition Law, and (5) violation of the right of publicity. Defendants have brought this motion to dismiss all of Plaintiff's claims under Fed. R. Civ. P. 12(b)(6). The Court GRANTS Defendants' motion in part and DENIES it in part.[1] Although Plaintiff's Complaint is marred by excessively conclusory language, the Court finds that Plaintiff has adequately stated claims for contributory and vicarious copyright infringement against Giganews. The remaining vague allegations in the Complaint are insufficient to state any other claim. Given the liberal standard of Fed. R. Civ. 15, the Court dismisses the remaining claims with leave to amend.

## I.    FACTS

Plaintiff is an adult entertainment company that produces and sells adult photographs, video productions, and other media. (Compl. ¶ 13.) Plaintiff derives its main source of revenue from selling access to adult images displayed on its website *perfect10.com*. (Compl. ¶ 17.) Due to the rampant infringement of its products, Plaintiff alleges, it has been forced to close down its previously well-known magazine *Perfect 10* and it no longer earns revenue from merchandise featuring its images. (Compl. ¶¶ 14-15.)

---

[1] Dkt. 11.

**Exh._M
Page 18**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

Plaintiff owns the copyrights to thousands of adult images, some of which are registered with the U.S. Copyright Office and some of which are pending registration. (Compl. ¶ 18.)  Plaintiff also owns several trademarks, including "PERFECT 10," "PERFECT10.COM," and "P10" (collectively "Perfect 10 marks").  (Compl. ¶ 19.)  In addition, some of the models featured in Perfect 10's products have assigned their rights of publicity to Perfect 10.  (Compl. ¶ 21.)  Plaintiff alleges that its business is almost entirely dependent on its intellectual property rights.  (Compl. ¶ 22.)

Defendants provide access to an online network called USENET.  (Compl. ¶ 24.) USENET is a global system of online bulletin boards that allow users to post materials related to a particular topic.  (Compl. ¶ 23.)  Each bulletin board is commonly referred to as a "newsgroup."  (Compl. ¶ 24.)  When a user posts something in a newsgroup, that post is called an "article."  (Compl. ¶ 24.)  Plaintiff alleges that in one category of newsgroups, called the "alt.binaries.*" newsgroups, users post almost exclusively pirated materials.  (Compl. ¶ 26.)

Although Plaintiff obscures these facts in the Complaint, the Court takes judicial notice of the following two generally known aspects about USENET.[2]  First, many other commercial providers besides Defendants provide access to USENET.  *See Religious Technology Center v. Netcom On-Line Communication Services, Inc.*,  907 F.Supp. 1361, 1366, n.4 (N.D.Cal. 1995) ("*Netcom*")  ("There is no specific network that is the Usenet. Usenet traffic flows over a wide range of networks, including the Internet and dial-up phone links."); *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 129 -130 (S.D.N.Y. 2009) ("*Usenet*") ("To obtain access to the USENET, a user must gain access through a commercial USENET provider . . . or an internet service provider.").  Second, the content on USENET is primarily user-driven–that is, the content that is stored on a USENET provider's server is generally uploaded by USENET users or subscribers.  *See Ellison v. Robertson*, 357 F.3d 1072, 1074 (9th Cir. 2004) ("USENET is . . . an international collection of organizations and individuals (known as 'peers') whose computers connect to one another and exchange messages posted by USENET users."); *Netcom*, 907 F.Supp. at 1366, n.4 ("As a Usenet user, you read and contribute ('post') to

---

[2] Courts may take judicial notice of matters of general knowledge. Fed. R. Evid. 201(b)(1); *see also, e.g., Sobhani v. @Radical.Media Inc.*, 257 F. Supp. 2d 1234, 1235 n.1 (C.D. Cal. 2003) (Wilson, J.) (taking judicial notice of the content of a motion picture and broadcast commercials).

Exh._M

Page 19

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

your local Usenet site.  Each Usenet site distributes its users' postings to other Usenet sites . . . .").

Defendants own and operate websites that sell USENET access for a monthly fee, starting at $4.99 per month.  (Compl. ¶ 24.)  The content posted by Defendants' subscribers and other USENET users, including infringing content, is stored on Defendants' servers.  (Compl. ¶ 25-26.)  Visitors to Defendants' websites can display the USENET content from the Defendants' servers or they may download that content directly onto their own computer.  (Compl. ¶ 24.)  Defendants' service permits their subscribers to search USENET content for specific files.  (Compl. ¶ 24.)  For example, a user interested in finding Perfect 10 works on Defendants' USENET servers might search for the term "Perfect 10."  (Compl. ¶ 24.)  The search results often yield titles containing the words "Perfect 10," "P10," or other Perfect 10 marks.  (Compl. ¶ 54.)  In some instances, the files or images whose titles contain the Perfect 10 marks show images that are of poor quality, are offensive, or have nothing to do with Perfect 10.  (Compl. ¶ 62.)

Plaintiff alleges that Defendants program their servers to distribute and download infringing content.  (Compl. ¶ 25.)  Plaintiff also alleges that Defendants control which materials are distributed to and copied from other third party servers.  (Compl. ¶ 25.)  Plaintiff contends that Defendants have infringed on more than 165,000 Perfect 10 copyrighted images and that Defendants are aware that they are illegally copying, distributing, and selling infringing materials.  (Compl. ¶¶ 28-29.)  According to Plaintiff, Defendants' ability to generate revenue is based almost exclusively on demand for the pirated works contained in the alt.binaries* newsgroups.  (Compl. ¶ 26.)

On March 25, 2009, Plaintiff sent a letter to Giganews notifying it that it was infringing Plaintiff's copyrights and rights of publicity, as well as the copyrights of third parties.[3]  (Compl. ¶ 31.)  Plaintiff included with the letter a DVD containing hundreds of Perfect 10 images, characterizing them as a "sampling of our copyrighted materials that

---

[3]  Defendants have attached a copy of Plaintiff's March 25 letter to Giganews, the DVD that accompanied Plaintiff's letter, and Giganews's response as Exhibits A-C to the Declaration of Ronald Yokubaitis.  Because Plaintiff refers to these documents in its Complaint, the Court deems these documents incorporated by reference.  *See Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001).  Plaintiff does not allege that it sent any notices to Defendant Livewire.

**Exh._M**
**Page 20**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

your site has offered for sale without any authorization whatsoever." (Decl. Yokubatis ¶ 2, Exh. A.) Plaintiff did not, however, list any copyright registration numbers or identify any specific article or message on Giganews's USENET servers that contained infringing content. (Compl. ¶ 31; Decl. Yokubatis, Exhs. A-C.) Giganews responded that it could not find the alleged infringing content based on Plaintiff's notice. (Compl. ¶ 31.) Giganews further explained to Plaintiff that each article posted on USENET has a unique message identification number, and if Plaintiff provided the identification numbers of the articles containing the infringing content, Giagnews would be able to find the specific infringing material and remove it. (Decl. Yokubatis ¶ 13, Exh. C, pp. 8-11.) Plaintiff disputes Giganews's claimed inability to find the infringing images, arguing that Giganews could have conducted a search using the image identifiers provided by Plaintiff in its notice and could have blocked any infringing images it found in that search. (Compl. ¶ 31.)

## II.    LEGAL STANDARD GOVERNING A MOTION TO DISMISS

A complaint may be dismissed for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal quotation marks and ellipsis omitted).

The plausibility standard articulated in *Twombly* and *Iqbal* requires that a complaint plead facts demonstrating "more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S.Ct. at 1949 (internal quotation marks and citation omitted).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience

**Exh._M
Page 21**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief.  *Iqbal*, 129 S.Ct. at 1950 (internal citation, alteration, and quotation marks omitted); *see Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the pleader to relief.") (citing *Iqbal*, 129 S.Ct. at 1949).

     To determine whether a complaint states a claim sufficient to withstand dismissal, a court considers the contents of the complaint and its attached exhibits, documents incorporated into the complaint by reference, and matters properly subject to judicial notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  The court must accept as true all factual allegations contained in the complaint.  That principle, however, "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S.Ct. at 1950.

     Where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the complaint could not be saved by any amendment.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

## III.   DISCUSSION

### A.   Copyright Infringement

     Plaintiff proceeds on its copyright infringement claim under theories of direct, contributory, and vicarious liability.  The analysis of the sufficiency of these claims is complicated by two factors.  First, as the Supreme Court has recognized, the "lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) ("*Napster II*") (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 435, n.17 (1984)).  Courts have struggled in particular with the question of whether a defendant who offers technology that enables third parties to exchange infringing content should be held *directly* liable.  As discussed *infra*, courts have reached different results on this issue.

**Exh._M**
**Page 22**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

 

Second, Plaintiff uses vague, conclusory language throughout the Complaint, making it difficult to discern what Defendants are alleged to have done, let alone whether those actions amount to direct, contributory, or vicarious copyright infringement. For example, Plaintiff alleges Defendants are "illegally copying, reproducing, distributing, displaying, and selling massive quantities of infringing materials" and that they are "distributors and sellers of pirated materials." (Compl. ¶ 28.) Such allegations amount to no more than legal conclusions that are not entitled to an assumption of truth for the purposes of a motion to dismiss. *See Iqbal*, 129 S.Ct. at 1950. Neither does Plaintiff support these conclusory allegations with any facts specifying how Defendants have copied and sold infringing materials other than to allege that they provide access to USENET. Are Defendants scanning files of Perfect 10 images and directly uploading them to USENET? Are Defendants searching USENET for Perfect 10 images and re-posting them to newsgroups to make them more widely available? If so, these allegations are absent from the Complaint.

In its opposition, Plaintiff contends it has adequately alleged that Defendants committed the following actions: (1) "Defendants program their computers to distribute known infringing content to other servers and to copy known infringing materials from other third party servers." (2) "Defendants select and control which newsgroups to distribute and copy, and knowingly copy and sell material from obviously infringing newsgroups."[4] (3) "Defendants have willfully copied, distributed, and sold at least 165,000 P10 Images, without Perfect 10's permission. (4) "Giganews sells access to the infringing material on its servers to Livewire." (Opp. 7-8.) These recharacterizations, only the third of which purports to deal with Perfect 10 specifically, are just as conclusory as Plaintiff's original allegations and do little to improve upon the Complaint. The non-conclusory facts the Court is able to glean from these statements are merely consistent with the allegation that Defendants are USENET providers who sell access to the USENET content stored on their servers.

Absent more specific non-conclusory facts, the Court can infer from the Complaint only that Plaintiff is basing its copyright infringement claims on the following allegations: (1) that Defendants are USENET providers who charge their subscribers a

---

[4] In the Complaint, actually, Plaintiff made no allegation that Defendants "select" which newsgroups to copy. (*See* Compl. ¶¶ 25-26, 28.)

Exh._M
Page 23

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | | Date | March 8, 2013 |
|---|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | | |

fee; (2) that Defendants program their computers to copy USENET content from other USENET servers and make this content available to their subscribers; (3) that USENET is now primarily used by its subscribers or visitors to exchange pirated content; (4) that Defendants are not only aware of the rampant piracy committed by USENET users but rely on the piracy as part of their business model; and (5) that Plaintiff has found at least 165,000 unauthorized Perfect 10 images on Defendants' USENET service. The Court will premise its ruling on these allegations.

    1.   <u>Direct Copyright Infringement</u>

      To allege a prima facie case of direct copyright infringement, Plaintiff must satisfy two requirements: (1) it must show ownership of the allegedly infringed material, and (2) it must demonstrate that Defendants committed an act of "copying" this material. *Perfect 10, Inc., v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights" under 17 U.S.C. § 106. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) ("*Napster II*") (quoting *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n.3 (9th Cir.1989)). These exclusive rights include the right to reproduce, distribute, publicly display, perform, or create derivative works of the copyrighted work. *See* 17 U.S.C. § 106. Plaintiff alleges that Defendants have copied, reproduced, distributed, adapted, and/or publicly displayed works copyrighted by Perfect 10, thereby directly violating its exclusive rights. (Compl. ¶ 36.)

      The parties do not dispute that Plaintiff has sufficiently alleged ownership of the allegedly infringed material. Indeed, Plaintiff has pleaded that it owns the copyrights to more than 165,000 images that Defendants have sold and distributed through their service. (Compl. ¶ 29.) Plaintiff has also attached as Exhibit 1 to the Complaint a list of the copyright registration numbers of some of its photographs. (Compl. ¶ 18, Exh. 1.) The Court therefore concludes that Plaintiff's allegations satisfy the first element (ownership) of a direct infringement claim.

      Whether Plaintiff has alleged an act of "copying" is a closer question. Based on the facts alleged by Plaintiff, it is clear that USENET users who upload copyrighted Perfect 10 images to the newsgroup infringe Perfect 10's copyrights. Moreover, it is clear that copyright infringement is a strict liability tort, making Defendants' mental state irrelevant. *See, e.g., Educ. Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal.

          **CIVIL MINUTES - GENERAL**         

**Exh._M**
**Page 24**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

1999).  But it is less clear whether by merely creating and operating programs that automatically copy copyrighted images in response to the commands of its users, Defendants can be said to have engaged in "copying" themselves.  Courts have struggled with the question of when and whether ownership of an apparatus or system that automatically creates copies when prompted by third party users can lead to direct infringement liability.  A leading case in the field, involving claims of direct infringement against another USENET access provider, provides a helpful analogy: does the "owner of a copy machine who lets the public make copies with it" commit direct copyright infringement if individuals use his machine to make unauthorized copies of copyrighted works?  *Netcom*, 907 F. Supp. at 1369.

In *Netcom*, Judge Whyte answered that question in the negative, and his ruling has become a seminal opinion in the field.  He reasoned that direct copyright infringement requires "some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." *Id.* at 1370.  Because Netcom's servers were programmed to *automatically* copy all content that was posted on Netcom's servers–including infringing content–without any volitional act by Netcom, Judge Whyte held that it could not be said to have "caused the copying," and thus could not be held liable for direct infringement.  *Id.* at 1369.

Although the Ninth Circuit has not spoken on the issue, the *Netcom* principle that "volitional" conduct is required for direct liability has been widely adopted, including by the Second and Fourth Circuits.  *See, e.g., Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2nd Cir. 2008) ("[A] significant difference exists between making a request to a human employee, who then volitionally operates the copying system, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct."); *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) ("[W]e conclude that *Netcom* made a particularly rational interpretation of § 106 when it concluded that a person had to engage in volitional conduct–specifically, the act constituting infringement–to become a direct infringer."); *see also Fox Broadcasting Co. Inc. v. Dish Network, L.C.C. ,* —F. Supp. 2d —, 2012 WL 5938563 (C.D. Cal. 2012) (Gee, J.); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006); *Parker v. Google, Inc.*, 422 F.Supp.2d 492, 497 (E.D. Pa. 2006).

**Exh._M**
**Page 25**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

     Notwithstanding these sound decisions, the concept of "volition" can be confusing. "Volitional" is sometimes understood to mean "intentional,"[5] and yet no showing of intent is required for direct infringement liability.  In this Court's view, the key to understanding the so-called "volitional conduct" requirement is to equate it with the requirement of causation, not intent.  "Just who caused the copyrighted material to be infringed?"  The Second Circuit's opinion in *Cartoon Network* is particularly helpful in this regard.  In the words of that court, "the question is *who* made this copy." 536 F.3d at 130.  The Second Circuit further clarified that the goal of the inquiry is to "identify the actor (or actors) whose 'conduct has been so significant and important a cause that [he or she] should be legally responsible." *Id.* at 132 (quoting W. Page Keeton et al., *Prosser and Keaton on Torts* § 42, at 273 (5th ed. 1984)).  Other district courts have astutely described this element of direct liability as requiring that plaintiffs show that the defendants must  "actively engage" in or "directly cause" the infringing activity in order to be held liable for direct infringement. *Perfect 10, Inc. v. Cybernet Ventures, Inc*, 213 F. Supp. 2d 1146, 1168 (C.D. Cal. 2002) (Baird, J.);  *Sega Enterprises, Ltd. v. MAPHIA*, 948 F. Supp. 923, 931 (N.D. Cal. 1996) (Wilken, J.).

     Notwithstanding the wide adoption of *Netcom*'s so-called volitional conduct requirement, some judges on the Central District have rejected it. In a recent case, Judge Feess reasoned that "in light of the fact that copyright infringement is a strict liability offense, the Court is not inclined to adopt a volitional conduct requirement without clear instruction from the Ninth Circuit... ."  *Arista Records LLC v. Myxer Inc.*, 2011 U.S. Dist. LEXIS 109668 at *48-49 (C.D. Cal. Apr. 1, 2011) (Feess, J.); *see also Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F.Supp.2d 1003, 1011 n.7 (C.D. Cal. 2011) (Walter, J.) (agreeing with Judge Feess's assessment in a footnote).  The Court respectfully disagrees with the reasoning expressed in these cases and adopts the principle expressed in *Netcom*, for several reasons.

     First, this Court does not interpret the Ninth Circuit's silence on the so-called "volitional conduct requirement" as disapproval.  In other Ninth Circuit copyright infringement decisions involving the Internet, either there was no question in those cases that the defendant had committed a volitional act or the plaintiffs were not pursuing direct infringement claims.  *See, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146,

---

     [5] *See* Merriam-Websters Collegiate Dictionary 1324 (10th ed. 1996) (defining "volition" as "the power of choosing or determining; WILL).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|----------|----------------------|------|---------------|

| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. |
|-------|---------------------------------------------|

1155-56 (9th Cir. 2007) (considering direct infringement claim against a defendant that had, *inter alia*, created thumbnails and cached pages of infringing photos and websites); *Ellison v. Robertson*, 357 F.3d 1072, 1076 n.4 (9th Cir. 2004) (considering only contributory and vicarious infringement claims because plaintiff abandoned direct infringement claim on appeal); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001) (considering contributory and vicarious infringement claims against provider of a file-sharing program).[6]

Next, the court in *Myxer* appears to have construed *Netcom*'s "volitional act" requirement as improperly imposing a minimum standard of intent onto a strict liability offense. *See Myxer Inc.*, 2011 U.S. Dist. LEXIS 109668 at *49. This Court does not view *Netcom* as having required a heightened showing of intent for the strict liability tort of direct copyright infringement. Rather, as discussed above, and in line with the persuasive explanation of the Second Circuit in *Cartoon Network*, by imposing a requirement of "volitional conduct" *Netcom* merely focused the inquiry on whether the defendant *directly caused* the infringement to take place. In ultimately holding that the causal relationship between the copyright infringement and the defendant's act of merely providing access to USENET was too weak to impose direct liability, the court in *Netcom* did not stray from the strict liability standard.

Turning to the allegations in Plaintiff's Complaint, the Court finds that Plaintiff has not alleged that Defendants were the direct cause of, or actively engaged in, direct infringement. Plaintiff does allege that Defendants copy all of the material on their servers from content uploaded onto USENET. (Compl. ¶ 24.) Plaintiff claims Defendants store these materials, most of which are infringing, on their servers and "program their servers" to distribute and download the infringing content. (Compl. ¶ 25.) In addition, Plaintiff alleges Defendants "control which materials are distributed to and copied from other third party servers." (Compl. ¶ 25.) These facts do not indicate that it was Defendants themselves that committed the act of copying, displaying or distributing Plaintiff's copyrighted content. Instead, these allegations are like the similar facts alleged in *Netcom*: that Defendants simply programmed their servers to automatically copy, distribute, and display content, including infringing content, uploaded by USENET users. To use *Netcom*'s analogy, Defendants here created virtual copy machines that some

---

[6] The direct infringement analysis in *Napster* focused on the actions of Napster's *users*, not Napster itself.

**Exh._M
Page 27**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

USENET users have used to create illegal copies.  Defendants merely engaged in the act of "designing or implementing a system that automatically and uniformly creates temporary copies of all data sent through it," whether that data contains infringing content or not.  *See Netcom*, 907 F.Supp. at 1369.  Such conduct does not constitute any volitional act.

Plaintiff's allegations regarding Defendants' knowledge of the pirated content on its servers do not salvage Plaintiff's direct infringement claim.  As the *Netcom* court pointed out, "knowledge" is not a required element of direct infringement (although it is a required element for contributory infringement).  *Id.* at 1370.  A participant in the chain of events that ultimately allows viewers to obtain infringed material does not become the "direct cause" of the copying merely because he learns of it.  Nor is it enough, as Plaintiff alleges, that Defendants "control which materials are distributed to and copied from other third party servers."  (Compl. ¶ 25.)  An allegation that Defendants control the content on their servers, without a good-faith allegation specifying how Defendants exercised that control to directly create copies, cannot alone create an inference that Defendants engaged in a volitional act directly causing infringement.  All owners of internet servers presumably can determine the content on their servers.  To hold that such control gives rise to a direct infringement claim would create "unreasonable liability."  *See Netcom*, 907 F.Supp. at 1368 (finding no direct infringement despite Netcom's ability to suspend accounts of subscribers and reprogram its system to block certain content); *CoStar*, 373 F.3d at 556 (holding that defendant's procedure of screening and blocking photos that violated its terms of service did not constitute a volitional act of infringement).

Plaintiff relies heavily on *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124 (S.D.N.Y. 2009) ("*Usenet*") to support its argument that knowledge of infringement does satisfy the "volitional conduct" inquiry.  The defendants in *Usenet* were USENET providers who were found to have acted volitionally because, among other things, they were aware that copyrighted music files were the most popular items on their servers, they actively created servers dedicated to storing music files, and they increased the file retention time of newsgroups that shared music.  *Id.* at 148.  In addition, the defendants determined which newsgroups their servers accepted and which they rejected,  "routinely exercis[ing] that control" through "both automated filtering and human review."  *Id.* Given these facts, the court concluded that the defendants were liable for direct infringement, finding that "their service [was] not merely a 'passive conduit' that facilitate[d] the exchange of content between users who upload[ed] infringing content and

**Exh._M**
**Page 28**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

users who download[ed] such content; rather, Defendants actively engaged in the process so as to satisfy the 'volitional-conduct' requirement for direct infringement." *Id.* at 149.


Like the *Usenet* court, several other district courts have taken into account a defendant's knowledge in determining whether that defendant engaged in volitional conduct. *See Perfect 10, Inc. v. MegaUpload*, CV 11-0191, Doc. 16 at *7 (S.D. Cal. July 26, 2011) (Gonzalez, J.) (finding Plaintiff had fulfilled volitional conduct requirement by alleging that the defendant created different websites to allow users to easily find different types of infringing media and encouraged and paid users to upload vast amounts of popular media); *Capitol Records, Inc. v. MP3tunes, LLC*, 2009 WL 3364036 at *3 (S.D.N.Y. 2009) (finding that plaintiffs' allegation that defendant's program collected and organized links to infringing music files fulfilled volitional conduct requirement); *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F.Supp. 503, 513 (N.D. Ohio 1997) (finding defendants acted volitionally by encouraging subscribers to upload files, including adult photographs, onto the system).

The Court disagrees with the application of the volitional act requirement in *Usenet*, *MegaUpload*, *Capitol Records*, and *Playboy Enterprises*. By focusing on the defendant's awareness or state of mind–rather than on *who* actually caused the infringement–these cases effectively hold defendants liable for copyright infringement committed by third parties without requiring a full assessment of the additional elements of secondary copyright infringement claims.[7] As one court has already noted:

> [*Usenet*] held that a policy encouraging infringement coupled with an ability–but refusal–to stop the massive infringement gave rise to a volitional act. But this conclusion ignores the language of *Netcom* and other cases following *Netcom*. As the Fourth Circuit put it, 'knowledge coupled with

---

[7] Plaintiff also cites to *New York Times Co., Inc. v. Tasini*, 533 U.S. 483 (2001) and several other cases that hold that making infringing materials available online constitutes a "distribution" under the Copyright Act. (Opp. 9-10.) These cases and Plaintiff's argument in that regard are inapposite. The question before this Court is not whether posting content online is a "distribution" but rather, *even assuming there was a distribution*, whether the *Defendants* can be regarded as having committed the distribution, as opposed to, or in addition to, the third party users who actually uploaded the infringing content onto USENET.

**Exh._M
Page 29**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

inducement' or 'supervision coupled with a financial interest in the illegal copying' gives rise to secondary liability, not direct-infringement liability.

*Disney Enterprises, Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1309 (S.D. Fla. 2011); *see also Sega Enterprises*, 498 F. Supp. at 932 (holding that defendant's knowledge of infringing activity is not relevant to whether the defendant "directly cause[d]" infringement). Accordingly, the Court holds that Plaintiff has not alleged that Defendants actively engage in or directly cause the infringement allegedly committed by their users. As such, the Court dismisses Plaintiff's claims for direct copyright infringement.

    2.    Secondary Copyright Infringement

     Plaintiff has also alleged that Defendants committed contributory and vicarious infringement of its copyrights. Before turning to these secondary liability claims, the Court addresses the question of whether Plaintiff has adequately pled predicate acts of direct infringement. "All theories of secondary liability for copyright and trademark infringement require some underlying direct infringement by a third party." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F. Supp. 2d 1098, 1104 (N.D. Cal. 2008). Defendants argue that Plaintiff has not met this requirement. The Court disagrees. Plaintiff plainly alleges that Defendants have "copied, distributed, displayed, and sold, more than 165,000 Perfect 10 copyrighted images . . . ." (Compl. ¶ 29.) Although Plaintiff makes no mention in the Complaint of a third party direct infringer (presumably in a misguided attempt to characterize Defendants as direct infringers), it is reasonable for the Court to infer from the Complaint that at least 165,000 Perfect 10 copyrighted images were allegedly found on Defendants' USENET service. That allegation is sufficient to raise a plausible inference that a third party reproduced those Perfect 10 works and used Defendants' USENET service to distribute and publicly display them.

        a.    *Contributory Copyright Infringement*

     A defendant who has not directly infringed on a copyright may still be liable for contributory infringement if the defendant (1) has knowledge of another's infringing conduct and (2) induces, causes, or materially contributes to that conduct. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1171 (9th Cir. 2007). In the context of cyberspace, the Ninth Circuit has held that "a computer system operator can be held

**Exh._M**
**Page 30**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

contributorily liable if it has actual knowledge that specific infringing material is available using its system and can take simple measures to prevent further damage to copyrighted work, yet continues to provide access to infringing works." *Amazon*, 508 F.3d at 1158 (citations and quotations omitted).

   i.  Knowledge of infringement

  In *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984), the Supreme Court ruled that the makers of a device that had both infringing and noninfringing uses could not be held liable merely based on their "constructive knowledge of the fact that their customers may use that equipment to make unauthorized copies of copyrighted material." The Ninth Circuit thereafter clarified in *Napster II* that the knowledge requirement for contributory infringement liability is satisfied when "a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system." 239 F.3d at 1021. The Circuit explained, however, that "absent any specific information which identifies infringing activity, a computer system operator cannot be held liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material." *Id.* (citing *Sony*, 464 U.S. at 436).

  Defendants argue that because knowledge must be of "specific" material, a defendant must know the copyright registration number and the specific location of the infringing content in order to be liable. The Court has found no authority supporting Defendants' contention.[8]  In fact, in his discussion of the knowledge requirement for contributory infringement in *Netcom*, Judge Whyte stated that "[t]o require proof of valid registrations would be impractical and would perhaps take too long to verify, making it impossible for a copyright holder to protect his or her works in some cases . . . ." 907 F.Supp. at 1374.  The court went on to suggest that such items as copyright notices on the

---

[8] Defendants argue that *Parker v. Google, Inc.*, 422 F.Supp.2d 492 (E.D. Pa. 2006) supports their position.  Defendants' reliance on *Parker* is misplaced.  *Parker* simply held that where the plaintiff had failed to "make any mention of specific registered works" when notifying the defendant of the infringement, the plaintiff could not satisfy the "knowledge" requirement.  *Id.* at 499.  The fact that the court used the words "specific registered works" does not mean that the court held that unless the plaintiff provided copyright registration numbers the defendants necessarily would lack knowledge. Rather, in that case, the defendants lacked knowledge because the plaintiff had failed to identify any copyrighted work at all.

**Exh._M**
**Page 31**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

copies or documentation from the copyright holder would be enough to provide knowledge of "likely infringement." *Id.*

*Napster II* establishes that the knowledge element is satisfied when a defendant knows that there has been a concrete incident of infringement of a specific copyrighted work, and *Netcom* explains why requiring knowledge of a specific registration is unnecessary and would be too burdensome. The defendant does not have to be aware of the copyright registration number or exact location of the infringing content in order for the knowledge to be specific; it is enough if the defendant has sufficient information to be able to find the specific infringing content on its system.

In this case, Plaintiff has alleged that it sent Giganews a notice that identified hundreds of Perfect 10 copyrighted images that Plaintiff had found using Defendants' service, some of which displayed a copyright notice. Plaintiff also alleges that Giganews has a search function which Giganews could have used to search for the infringing content based on the image identifiers Plaintiff provided in its notice. The Court finds these allegations sufficient to support Plaintiff's claim that Giganews had "knowledge" of the content infringing Plaintiff's copyrights. Discovery may yield facts that could lead a jury to conclude that it would have been easy for Giganews to find specific infringing content. Although discovery might reveal that the information provided by Plaintiff was not enough to identify any infringing articles, at this stage Plaintiff has pled enough facts to give rise to a plausible inference that Giganews knew of specific infringing Perfect 10 images on its servers.

On the other hand, the Complaint does not adequately plead that Defendant Livewire knew of specific infringing works. Plaintiff does not allege that it or anyone else notified Livewire of unauthorized Perfect 10 images on its servers. Thus, Plaintiff is forced to rely only on its allegation that Livewire knew generally that USENET was used to exchange pirated content. This is precisely the type of general knowledge that was rejected by the Supreme Court in *Sony*. As such, Plaintiff has failed to state a claim for contributory infringement against Livewire.

ii.     Material contribution

Having alleged that Giganews knew of direct infringement, Plaintiff must also show that Giganews induced or materially contributed to the infringement. *Amazon,* 508

**Exh._M
Page 32**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|----------|---------------------|------|---------------|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

F.3d at 1171 (9th Cir. 2007).  Courts have directly addressed the issue of whether "[p]roviding a service that allows for the automatic distribution of all Usenet postings, infringing and noninfringing" could constitute a material contribution to infringing activity.  *See, e.g., Ellison*, 357 F.3d at 1078; *Netcom*, 907 F.Supp. at 1059.  In both *Ellison* and *Netcom*, the courts held that a reasonable trier of fact could find that the very acts of storing infringing copies and providing access to the content on USENET constituted a material contribution.  In this case, Plaintiff has alleged that Defendants provide access to USENET, a system that is now widely known to be a source of pirated content, and that Defendants' storage of USENET content on their servers facilitates the exchange of pirated works among Defendants' subscribers and other USENET users. These facts sufficiently allege that Defendants materially contributed to the infringement.

Based on the above, the Court finds that Plaintiff has stated a claim for contributory copyright infringement against Giganews but not Livewire.  The contributory infringement claim against Livewire is dismissed with leave to amend.

### b.   *Vicarious Infringement*

A defendant may also be liable under a vicarious infringement theory "by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. at 930.  To prove vicarious infringement, Plaintiff must show (1) that Defendants enjoy a direct financial benefit from the infringing activity of its subscribers, and (2) that Defendants have declined to exercise the right and ability to supervise or control the infringing activity.  *Ellison*, 357 F.3d at 1076.

### i.   Direct financial benefit

"Financial benefit exists where the availability of infringing material 'acts as a "draw" for customers.'" *Napster II*, 239 F.3d at 1023 (quoting *Fonovisa, Inc. v. Cherry Auction, Inc*., 76 F.3d 259, 263-64 (9th Cir.1996)). "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits." *Ellison*, 357 F.3d at 1079 (emphasis in original).

**Exh._M**
**Page 33**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

     Plaintiff alleges that Defendants, who are USENET providers, sell access to their servers for "as little as $4.99 per month." (Compl. ¶ 24.) Plaintiff also alleges that the interest in USENET is now largely centered around alt.binaries* newsgroups and that "Defendants' ability to generate monthly subscriptions and revenues is based almost exclusively on the demand for pirated copyrighted works contained in the alt.binaries* hierarchies." (Compl. ¶ 26.) In short, Plaintiff claims that those who subscribe to Defendants' service do so primarily because of the availability of pirated material, including Plaintiff's copyrighted images, on Defendants' USENET servers. These allegations sufficiently establish that Defendants enjoy a direct financial benefit from the infringing content on their servers.

     Defendants nevertheless argue that Plaintiff's vicarious liability claim must fail because Plaintiff alleges that Defendants charge a fixed fee without alleging that Defendants "*gained* or *lost* subscribers as a direct result of the availability of infringing materials." (Reply 8 (emphasis in original).) Defendants rely on *Netcom* for the proposition that "[a] fixed fee . . . cannot constitute a direct financial benefit required for vicarious infringement." (Mot. 14.) It is true that in *Netcom*, the court found that a defendant internet service provider that charged a fixed fee which did not depend on the nature of the activity of the user did not derive a direct financial benefit from the alleged infringing activity on its USENET servers. *See* 907 F.Supp. at 1377. The Ninth Circuit reached the same result in *Ellison*, noting, "[t]here is no evidence that indicates that [the defendant's] customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer available." 357 F.3d at 1079. This Court declines, however, to interpret either *Netcom* or *Ellison* as establishing a categorical rule that fixed fees preclude a finding of a direct financial benefit as a matter of law. Rather than establishing a fixed principle of pleading on a motion to dismiss, in those cases the courts examined evidence already presented by the parties and found no causal relationship between the fixed fee charged by the defendants and the infringing activity of their subscribers. *Netcom* was a decision on both a summary judgment motion and a preliminary injunction motion. Judge Whyte examined the adequacy (or inadequacy, as it turned out) of the evidence before him, not an abstract pleading issue. *Netcom*, 907 F.Supp. at 1377 ("Netcom receives a fixed fee. There is no evidence that infringement by Erlich, or any other user of Netcom's services, in any way enhances the value of Netcom's services to subscribers or attracts new members."). *Ellison*, too, was an appeal from a summary judgment ruling, not a motion to dismiss. *Ellison*, 357 F.3d at 1079 ("While a causal relationship might exist between AOL's profits from subscriptions and

**Exh._M**
**Page 34**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

the infringing activity taking place on its USENET servers, Ellison has not offered enough evidence for a reasonable juror so to conclude."). Moreover, the Ninth Circuit in *Ellison* explicitly noted the possibility that some fixed-fee services *could* be construed as receiving a direct financial benefit for purposes of vicarious infringement:

> Congress cautions courts that "receiving a one-time set-up fee and flat periodic payments for service . . . [ordinarily] would not constitute receiving a 'financial benefit directly attributable to the infringing activity.' " S. Rep. 105-190, at 44. *But "where the value of the service lies in providing access to infringing material," courts might find such "one-time set-up and flat periodic" fees to constitute a direct financial benefit. Id.* at 44-45. Thus, the central question of the "direct financial benefit" inquiry in this case is whether the infringing activity constitutes a draw for subscribers, not just an added benefit.

*Id.* at 1079 (emphasis added).

Plaintiff alleges that USENET is now used *primarily* for pirated content and that the availability of the pirated content is what attracts most of Defendants' monthly customers. (Compl. ¶ 26.) ("Defendants' ability to generate monthly subscriptions and revenues is based almost exclusively on the demand for pirated copyrighted works contained in the alt.binaries* hierarchies."). In other words, Defendants allegedly charge a fixed fee for a service that mainly exists to provide access to the infringing material on USENET. At the motion to dismiss stage, the Court must accept these allegations as true. Thus, Plaintiff has properly alleged that the fixed fee charged by Defendants is a direct financial benefit.

### ii.    Control

The "control" element of the vicarious liability test is determined by the defendant's "right and ability to supervise the direct infringer." *Grokster*, 545 U.S. at 930 n.9. "[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Amazon*, 508 F.3d 1146, 1173 (9th Cir. 2007). "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster II*, 239 F.3d at 1023.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

Defendant Giganews has attached the terms of use for Giganews as an exhibit to its motion.[9]  The terms of use clearly state that Giganews has the power to suspend and cancel the accounts of its users.  (Decl. Kearney, Exh. A, pp. 5-6.)  In addition, as the Court has already discussed, Plaintiff alleges that Giganews can easily find unauthorized Perfect 10 images on its servers by using its search function.  Based on these facts and allegations, Plaintiff has satisfied the "control" element with respect to Giganews subscribers.

Plaintiff has not alleged any facts, however, showing what control Giganews exerts over USENET users who are not Giganews subscribers.  Nor does Plaintiff allege that Livewire has any power over third party infringers.  Thus, Plaintiff has stated a claim for vicarious liability against Giganews for copyright infringement committed by Giganews subscribers only.  The vicarious copyright claim against Livewire is dismissed with leave to amend.

B.     Trademark Claims

Plaintiff raises three trademark claims: direct infringement, secondary infringement, and trademark dilution.  The Court concludes that none of these causes of action has been pled adequately.

1.     <u>Direct</u> <u>Trademark</u> <u>Infringement</u>

In order to state a valid claim of direct trademark infringement, Plaintiff must allege that Defendants "used" their mark "in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive... ." 15 U.S.C. § 1114(1)(a).  In their motion to dismiss, Defendants contend that Plaintiff has not alleged that they used Perfect 10's marks in connection with the sale or advertising of any good or service.  In response, Plaintiff points to the following allegations in its complaint: Defendants have copied and sold 165,000 images, many of which bear Perfect 10's marks

---

[9] Defendants **ask** the court to incorporate the terms of use by reference, arguing that they demonstrate Giganews's commitment to stopping copyright infringement.  (Mot. at 3).  Plaintiff does not object.

Exh._M
Page 36

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

(Compl. ¶ 29); Defendants allow their users to use Perfect 10 marks to conduct searches (Compl. ¶ 24); and when a user searches for one of Perfect 10's works, Defendants provide search results containing Perfect 10's marks in the title (Compl. ¶ 54).

Although Plaintiff alleges that Defendants have "sold" works bearing the Perfect 10 mark to their users, nowhere does Plaintiff allege that Defendants were paid for the images that their users could obtain through access to USENET. Rather, the fees that Defendants receive result from their providing access to a wide variety of content, including some content that bears Plaintiff's marks and other content that does not. Plaintiff fails to explain how Defendants' service constitutes the "use" of the Perfect 10 mark in the sale or marketing of a good or service. Nor has Plaintiff cited any authority to support the proposition that providing access to a forum where content bearing a trademark may be obtained constitutes "use" of that mark within the meaning of § 1114(1)(a).

Moreover, Defendants do not "use" Plaintiff's marks in a commercial transaction by merely offering a search function that allows third parties to search for images using Plaintiff's marks as search terms. The Court is unaware of any authority that would support such a broad construction of direct trademark infringement law, and Plaintiff does not cite any. Direct infringement requires that the defendant itself "use" the mark; it is insufficient for direct infringement purposes to allege that a defendant allows third parties to use the mark. *See* 15 U.S.C. § 1114(1)(a). Accordingly, the Court dismisses Plaintiff's direct trademark infringement claim.

      2.    <u>Secondary Trademark Infringement Claims</u>

Plaintiff has also alleged claims for contributory and vicarious trademark infringement in violation of Sections 32 and 43 of the Lanham Act. Plaintiff's secondary trademark infringement claims fail because Plaintiff has failed to allege an underlying act of direct trademark infringement by a third party. "All theories of secondary liability" for trademark infringement "require some underlying direct infringement by a third party." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F. Supp. 2d 1098, 1104 (N.D. Cal. 2008) (citing *Perfect 10, Inc. v. Visa Intern. Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007)). According to the Ninth Circuit, "trademark infringement law prevents only unauthorized uses of a trademark *in connection with a commercial transaction* in which the trademark is being used to confuse potential consumers." *Bosley Medical Institute,*

**Exh._M
Page 37**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

*Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005). Plaintiff's Complaint is bereft of any allegations that a third party used Plaintiff's marks in connection with a commercial transaction. Plaintiff has not alleged, for example, that any of Defendants' subscribers used Defendants' USENET service to sell products bearing Plaintiff's marks. To the contrary, Plaintiff alleges that customers are drawn to Defendants' USENET service because it offers the ability to *view* infringing products for free.[10] *See Bosley Medical*, 403 F.3d at 677 ("[T]rademark infringement protects only against mistaken *purchasing decisions* and not against confusion generally.") (internal quotation marks and citation omitted). Because Plaintiff has not pled that any third party user used a Perfect 10 trademark in connection with a commercial transaction, its secondary trademark infringement claims fail.

> 3.    Trademark Dilution

In order to state a trademark dilution claim, a plaintiff must allege that "(1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008). Thus, like a claim for direct trademark infringement, a trademark dilution claim is premised on the conduct of the defendant–*i.e.*, his "use" of the mark–and not on the acts of third parties.

Plaintiff's trademark dilution claim suffers the same flaw as its direct trademark infringement claim: Plaintiff has not alleged that Defendants have "used" Plaintiff's protected marks. Plaintiff's sole factual allegation in support of this claim is that "Defendant's [sic] provide their users with files or groups of images whose names contain [Perfect 10] marks, which either intermingle Perfect 10's high-quality images with images of poor-quality or of an offensive or illegal nature owned by third parties, or provide solely low quality explicit images that have nothing to do with Perfect 10." (Compl. ¶ 62). Notably, Plaintiff does not allege that Defendants *themselves*

---

[10] In contrast, in *Visa* Perfect 10 did plead an underlying act of direct infringement by third parties: it alleged that certain webistes had *sold* images bearing its marks. *Visa*, 494 F.3d 788, 807-08. Nevertheless, the Ninth Circuit rejected Perfect 10's secondary trademark infringement claims on other grounds. *Id.*

**Exh._M**
**Page 38**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

intermingled or degraded Plaintiff's marks; rather, Plaintiffs merely allege that
Defendants have provided access to files and images (created by third parties) that
degrade the marks. Without any such allegation, Plaintiff's claim for trademark dilution
fails as well.

    C.    State Law Claims and Preemption under the Communications Decency
        Act

    Finally, Plaintiff asserts claims under California law for violation of the rights of
publicity assigned to it and for violation of the Unfair Competition Law ("UCL").
Defendants argue that the Communications Decency Act ("CDA") provides them with
immunity against these claims.  The Court agrees with Defendants and dismisses these
claims.

    Under the CDA, "[n]o provider or user of an interactive computer service shall be
treated as the publisher or speaker of any information provided by another information
content provider." 47 U.S.C § 230(c)(1). In this case, Plaintiff does not dispute that
Defendants are providers of an "interactive computer service."  In *Perfect 10, Inc. v.
CCBill LLC*, a case involving Plaintiff, the Ninth Circuit held that the CDA establishes
"broad federal immunity to any cause of action that would make service providers liable
for information originating with a third-party user of the service" and expressly preempts
conflicting state laws.  488 F.3d 1102, 1118 (9th Cir. 2007).[11]

    Thus, the CDA provides Defendants immunity from state-law claims based on
"information originating with a third-party user of the service." *See CCBill LLC*, 488
F.3d at 1118.  The Court concludes that Plaintiff's California law claims fall within this
definition.  Plaintiff alleges that Defendants allegedly violated the publicity rights of
certain Perfect 10 models, which rights have been assigned to Perfect 10, by making
available search results containing the models' names and providing images, including
explicit or offensive images, that were not of the model.  (Compl. ¶ 74.)  Plaintiff also

---

    [11] The CDA's grant of immunity is limited by § 230(e)(2), which prohibits courts from
construing the CDA to "limit or expand any law pertaining to intellectual property."  *Id.*  In *CCBill*,
however, the Ninth Circuit construed this exception to CDA immunity as applying only to claims arising
under "federal intellectual property" laws.  *Id.* at 1119.  Consequently, the Circuit held the defendants
were eligible for immunity under the CDA for the California right of publicity and UCL claims at issue
in that case.  *Id.*

**Exh._M
Page 39**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

claims Defendants have violated the UCL by, *inter alia*, (1) "offering for free" adult-oriented content without purchasing expensive licenses, thereby making it impossible for businesses like Perfect 10 that actually purchase these licenses to compete; and (2) infringing and diluting Perfect 10's marks and the trademarks of others. (Compl. ¶¶ 65-66.) All of these allegations are based on the actions of third party USENET users, not Defendants.[12] Plaintiff does not allege that Defendants themselves used the names of Perfect 10 models to mislabel image files or that they posted unlicensed content onto USENET. Accordingly, under *CCBill*, Plaintiff's state law claims are preempted by the CDA.

The Court also rejects Plaintiff's argument that CDA immunity does not apply because Defendants, in addition to being "provider[s] of an interactive computer service," are also "information content provider[s]." *See* § 230(c)(1). An "information content provider," defined as "any person or entity that is responsible, in whole or in part, for the creation or development" of the offending content, is not entitled to CDA immunity. *See* 47 U.S.C. § 203(f)(3). To support this argument, Plaintiff relies on *Fair Housing Counsel of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008), in which the Ninth Circuit held that an online roommate-matching service was not entitled to CDA immunity for certain California discrimination claims. In that case, the defendant's website required its users to divulge their sex, family status, and sexual orientation, information that third parties allegedly used to discriminate in roommate selection. *Id.* at 1164. Because it was the defendant who created the questions that elicited that information, the Ninth Circuit held that even though the answers were ultimately selected by third party users, the defendant itself was "undoubtedly the 'information content provider' as to the questions" and thus could claim no immunity under the CDA. *Id.* Despite its reliance on *Roommates*, Plaintiff does not point to any allegation in the complaint that Defendants contributed to the *creation or development* of

---

[12] The only allegation in support of Plaintiff's UCL claim that can be directly attributed to Defendants is that Defendants have multiple websites that sell access to the same USENET content. (Compl. ¶ 67.) Plaintiff claims Defendants offer these websites "hoping" that consumers will purchase multiple memberships without knowing that they provide access to the same content. (*Id.*) However, Plaintiff lacks standing to assert a UCL claim based on this allegation. To state a UCL claim, Plaintiff must allege that it has "suffered an injury in fact and lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Plaintiff does not specify how Defendants' multiple websites have caused it injury. Thus, Plaintiff cannot maintain a claim based on this allegedly deceptive practice.

**Exh._M**
**Page 40**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV11-07098 AHM (SHx) | Date | March 8, 2013 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GIGANEWS, INC., ET AL. | | |

the offending content. *Roommates* makes clear that if a defendant passively displays content created entirely by a third party, CDA immunity applies, even if the defendant's service made it possible to display the content in the first place. *Id.* at 1173-74. Nor has Plaintiff alleged that Defendants have *required* third parties to create or develop infringing content as a condition of its service, in contrast to the defendant in *Roommates*. Thus, Plaintiff has not established that Defendants are "information content providers" who lack CDA immunity. Because the CDA shields Defendants against Plaintiff's state-law claims, those claims are dismissed.

**V.      CONCLUSION**

      For the above reasons, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss. Plaintiff has sufficiently alleged claims for contributory and vicarious copyright infringement against Defendants Giganews. All other claims are dismissed. In accordance with the liberal policies of Fed. R. Civ. P. 15, leave to amend is granted for all claims except the state law claims. The amended complaint must be filed no later than 14 days from the date of this order.

      The Court notes that in defending its claims, Plaintiff has done little more than recite and at times exaggerate the conclusory allegations in its Complaint. If Plaintiff does choose to amend, Plaintiff is admonished not to use the same vague and conclusory language that plagued the original Complaint.

_____   :   _____

Initials of Preparer                     SMO

**Exh._M**
**Page 41**

# EXHIBIT N

1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   PERFECT 10, INC., a California                    CASE NO. 11-CV-00905 H (MDD)
     corporation,
12                                                     **ORDER GRANTING MOTION**
                                          Plaintiff,   **TO CHANGE VENUE**
13          vs.

14   GIGANEWS, INC., a Texas corporation;
     LIVEWIRE SERVICES, INC., a Nevada
15   corporation; and DOES 1 through 100,
     inclusive,
16
                                        Defendants.
17

18          On  June  21,  2011,  Defendants  Giganews,  Inc,  and  Livewire  Services,  Inc.

19   ("Defendants") filed a motion to change venue in this case. (Doc. No. 10.)  On July 18, 2011,

20   Plaintiff Perfect 10, Inc. filed its response in opposition to Defendants' motion. (Doc. No. 32.)

21   On August 19, 2011, Defendants filed their reply.  (Doc. No. 50.)  The Court, pursuant to its

22   discretion under Local Rule 7.1(d)(1), determines this matter to be appropriate for resolution

23   without oral argument, submits it on the parties' papers, and vacates the motion hearing set for

24   August  29,  2011.   For  the  following  reasons,  the  Court  GRANTS  Defendants'  motion  to

25   change venue, and directs the Clerk to transfer this case to the Central District of California.

26   ///

27   ///

28

**Exh._N**
**Page 42**

**Background**

Plaintiff Perfect 10 is engaged in the business of design, creation, production, marketing, promotion, and sale of copyrighted adult entertainment products, including photographs, magazines, video productions, and other media.  (Doc. No. 1, Compl. ¶ 13.)  Perfect 10 is a California corporation with offices in Los Angeles.  (Doc. No. 10-4, Kearney Decl. ¶ 2 & Ex. A.)  Perfect 10's founder and principal Norman Zada resides within the Central District of California.  (Kearney Decl. ¶ 3 & Ex. B.)  Its accountant and its DMCA Agent also reside in the Central District.  (Kearney Decl. ¶¶ 4-6.)  The Court takes judicial notice under Federal Rule of Evidence 201, that since 1997, Perfect 10 brought 24 cases in the Central District of California.[1]  The Central District is currently presiding over one Perfect 10 case with closely similar claims against an Internet service provider.  See Perfect 10, Inc. v. Google, Inc., No. 04-CV-9484 (filed Nov. 19, 2004).  On April 28, 2011, Plaintiff filed a complaint against Defendants in this Court, alleging causes of action for (1) copyright infringement; (2) trademark infringement; (3) trademark dilution; (4) unfair competition; and (5) violation of rights of publicity.  (Doc. No. 1., Compl.)

Defendants contend that they are Internet service providers that provide Usenet access to their users.  (Doc. No. 10-1 at 6.)  Defendant Giganews is a Texas corporation headquartered in Austin, Texas.  (Id.) Defendant Livewire is a Nevada corporation.  (Id.) Defendants contend that neither Giganews nor Livewire owns or leases any equipment of any kind or maintains any facilities or employees in the Southern District of California.

---

[1] See, e.g., Perfect 10, Inc. v. Rasen et al., No. 97-CV-6967 (filed Sept. 19, 1997); Perfect 10, Inc. v. Internet Video Group, No. 99-CV-5332 (filed May 20, 1999); Perfect 10, Inc. v. Radvinsky et al., No. 99-CV-7376 (filed July 19, 1999); Perfect 10, Inc. v. Talisman Communicat, et al., No. 99-CV-10450 (filed Oct. 12, 1999); Perfect 10, Inc. v. Lytell, et al., No. 00-CV-11404 (filed Oct. 26, 2000); Perfect 10, Inc. v. Global Innovations, et al., No. 00-CV-11671 (filed Nov. 2, 2000); Perfect 10, Inc. v. Brainstorm Software, et al., No. 00-CV-11959 (filed Nov. 8, 2000); Perfect 10, Inc. v. AKA Entertainment, et al., No. 00-CV-13182 (filed Dec. 15, 2000); Perfect 10, Inc. v. Cybernet Ventures, No. 01-CV-2595 (filed Mar. 20, 2001); Perfect 10, Inc. v. Edghill, et al., No. 01-CV-3748 (filed Apr. 24, 2001); Perfect 10, Inc. v. Guba LLC, No. 02-CV-2842 (filed June 13, 2002); Perfect 10, Inc. v. CCBill LLC, No. 02-CV-7624 (filed Sept. 30, 2002); Perfect 10, Inc. v. Full Moon Internet, No. 03-CV-1129 (filed Feb. 18, 2003); Perfect 10, Inc. v. Amazon.com, No. 05-CV-4753 (filed June 29, 2005); Perfect 10, Inc. v. Microsoft Corp., No. 07-CV-5156 (filed Aug. 8, 2007).

Exh._N
Page 43

**Discussion**

**I. Legal Standard**

Under 28 U.S.C. § 1404, a district court "may transfer any civil action to any other district or division where it might have been brought" "for the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a). This statute "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 29 (1988) (quoting <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 622 (1964)). The purpose of section 1404(a) is to "prevent the waste of time, energy, and money to protect litigants, witnesses and the public against unnecessary inconvenience and expense." <u>Van Dusen</u>, 376 U.S. at 616. The Ninth Circuit recognizes that the "[w]eighing of factors for and against transfer involves subtle considerations and is best left to the discretion of the trial judge." <u>Sparling v. Hoffman Constr. Co., Inc.</u>, 864 F.2d 635, 639 (9th Cir. 1988) (quotation marks omitted). In addition, "[i]f the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter, the plaintiff's choice [of venue] is entitled only to minimal consideration." <u>Pacific Car & Foundry Co. v. Pence</u>, 403 F.2d 949, 954 (9th Cir. 1968).

In determining whether transfer is appropriate in a particular case, courts consider factors such as (1) the plaintiff's choice of forum; (2) the respective parties' contacts with the forum; (3) the contacts relating to the plaintiff's cause of action in the chosen forum; (4) the differences in the costs of litigation in the two forums; (5) the availability of compulsory process to compel attendance of unwilling non-party witnesses; (6) the ease of access to evidence; (7) the local interest in having localized controversies decided at home; (8) the unfairness of burdening citizens in an unrelated forum with jury duty; and (9) the relative congestion of dockets in the two districts, measured by the median number of months from filing to trial. <u>Jones v. GNC Franchising, Inc.</u>, 211 F.3d 495, 498-99 (9th Cir. 2000); <u>Decker Coal Co.</u>, 805 F.2d at 843; <u>Saleh v. Titan Corp.</u>, 361 F. Supp. 2d 1152, 1167 (S.D. Cal. 2005). Defendant, as the moving party, carries the burden of showing that transfer is warranted.

**Exh._N
Page 44**

1    <u>Commodity Futures Trading Comm'n v. Savage</u>, 611 F.2d 270, 279 (9th Cir. 1979).  To show

2    that the action could have been brought in the Central District of California, the moving party

3    need only show that the transferee court would have had subject-matter jurisdiction, defendant

4    would have been subject to personal jurisdiction, and venue would have been proper.  <u>See</u> 28

5    U.S.C. § 1404(a).

6    **II.    Analysis**

7         Defendants argue that Perfect 10 could have brought this case in the Central District of

8    California, and a transfer to the Central District meets the threshold requirement of § 1404(a).

9    First, Defendants argue that venue is proper in the Central District pursuant to 28 U.S.C. §§

10   1391(b)(1) and (c) because Defendants have "consummated . . . transaction[s] with the forum

11   or resident[s] thereof" by locating servers in the Central District, and Perfect 10's claims

12   "relate[] to" those forum-related activities.  Defendants argue that they have no facilities,

13   employees or equipment in the Southern District.  Defendants offer a declaration by Philip

14   Molter, the Chief Technology Officer of Defendant Giganews, which states that "Giganews's

15   only California-based servers are its Usenet servers in Los Angeles, California."  (Doc. No.

16   51 at ¶ 7.)

17        Secondly, Defendants argue that the Central District is "a judicial district in which a

18   substantial part of the events or omissions giving rise to the claim occurred, or a substantial

19   part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2).  Perfect

20   10 alleges that Defendants infringed its copyrights by means of their servers.  (Compl. ¶ 25.)

21   "[A] copyright is an intangible, incorporeal right that has no situs apart from the domicile

22   of the proprietor."  <u>Sullivan v. Author Solutions, Inc.</u>, 2008 WL 2937786 (E.D. Wis. July 23,

23   2008) (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.01[C]

24   (1963)).  Here, Perfect 10 is located in the Central District, and thus its copyrights are

25   domiciled in the Central District.  Additionally, Defendant Giganews's only California-based

26   servers are located in downtown Los Angeles, which is in the Central District.

27        Finally, Defendants argue that venue is proper in the Central District under 28 U.S.C.

28   § 1400, which provides that a civil action "relating to copyrights . . . may be instituted in the

**Exh._N
Page 45**

1   district in which the defendant or his agent resides or may be found." 28 U.S.C. § 1400(a).

2   The Ninth Circuit has interpreted this statute to mean that venue "is proper in any judicial

3   district in which the defendant would be amenable to personal jurisdiction if the district were

4   a separate state." Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc., 106

5   F.3d 284, 288 (9th Cir.), rev'd on other grounds sub nom. Feltner v. Columbia Pictures

6   Television, Inc., 523 U.S. 340 (1998).

7      In opposition, Perfect 10 argues that it has suffered injury in the Southern District

8   because Defendants likely have subscribers there, and because some of those subscribers are

9   able to download infringing material. (Doc. No. 32 at 10-11.) Perfect 10 does not allege that

10   any subscribers have actually downloaded infringing material, and does not identify any

11   specific infringements or any alleged direct infringer in the Southern District. The mere fact

12   that Perfect 10 has a website does not provide a nexus to the Southern District–by this logic,

13   venue would be proper anywhere in the United States. Instead, a plaintiff must show that its

14   choice of venue is supported by a "specific connection" to the venue. Gonzales v. Palo Alto

15   Labs, Inc., No. C 10-2456, 2010 WL 3930440, *8 (N.D. Cal. Oct. 6, 2010). A lack of such

16   specific connection "favor[s] transfer." Id.

17      Defendants also argue that a  number of likely witnesses, including third party

18   witnesses, live and work in the Central District. (Doc. No. 10-1 at 14.) Defendants argue that

19   Plaintiff's accountant, as well as its models who will likely be key witnesses, are located in the

20   Central District. "The relative convenience to the witnesses is often recognized as the most

21   important factor to be considered in ruling on a motion under § 1404(a)." Saleh, 361 F. Supp.

22   2d at 1160. Thus, this factor weighs in favor of transfer.

23      Additionally, Defendants argue that until recently, Perfect 10 filed cases in the Central

24   District of California, where it brought a total of 24 cases in the last fourteen years.

25   Defendants point out that  Perfect 10 is currently involved in litigation in the Central District,

26   in a closely similar case in which it chose the venue. Defendants argue that the Central District

27   is very familiar with the issues raised in Plaintiff's copyright infringement litigation against

28   Internet service providers, because Perfect 10 has filed several similar cases in that District.

Exh._N

Page 46

1   By contrast, Perfect 10 filed only six cases in the Southern District, and they involved

2   infringement claims against "storage lockers"–websites that offer private online storage space

3   to subscribers.  Five of the six cases filed by Perfect 10 in the Southern District are against

4   overseas defendants, who are less likely to challenge Plaintiff's choice of venue.[2]

5          The Court concludes that transferring this case to the Central District will serve the

6   interests of justice and the convenience of witnesses and the parties.  See 28 U.S.C. § 1404(a).

7   Here, Perfect 10 has failed to show the specific connection to the Southern District, and the

8   majority of witnesses are located in the Central District.  Accordingly, the Court concludes that

9   transferring this case to the Central District is appropriate and grants Defendants' motion to

10  change venue.

11                                    **Conclusion**

12         For the reasons above, the Court GRANTS Defendants' motion to change venue and

13  directs the Clerk to transfer this case to the Central District of California.

14         **IT IS SO ORDERED.**

15  DATED: August 25, 2011

16

17                                    MARILYN L. HUFF, District Judge
                                      UNITED STATES DISTRICT COURT
18

19

20

21

22

23

24  _____

25         [2] Perfect 10, Inc. v. Rapidshare AG, No. 09-CV-2596 (filed Nov. 18, 2009) (defendant
    Swiss company); Perfect 10, Inc. v. Netsaits B.v., No. 10-CV-1773 (filed Aug. 25, 2010)
26  (defendant Dutch corporation); Perfect 10, Inc. v. Hotfile Corp., No. 10-CV-2031 (filed Sept.
    29, 2010) (defendant Panamanian corporation); Perfect 10, Inc. v. Megaupload Limited, No.
27  11-CV-191 (filed Jan. 31, 2011) (defendant Hong Kong corporation); Perfect 10, Inc. v.
    Kalmet Investments Limited, No. 11-CV-1416 (filed June 28, 2011) (defendant Seyshelles
28  entity).

**Exh._N
Page 47**